# STATE OF MICHIGAN

# COURT OF APPEALS

---

LN REAL ESTATE, LLC,

        Plaintiff/Counter-Defendant-
Appellee,

v

KINGDOM LIVING CHURCH,

        Defendant/Counter-Plaintiff-
Appellant.

UNPUBLISHED
November 28, 2017

No. 333208
Genesee Circuit Court
LC No. 16-105381-CK

---

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

After several years of renting property for its operations, Kingdom Living Church failed to make a high enough offer to purchase the property and was ultimately evicted by court order. It filed several counterclaims, seeking to remain in residence or at least to obtain reimbursement for the cost of its renovations, but the circuit court summarily dismissed them all. We affirm the majority of the circuit court's judgment, but vacate its grant of summary disposition in favor of the landlord on its slander-of-title claim and summary dismissal of the church's discrimination counterclaim. We remand for further proceedings on those two counts.

## I. BACKGROUND

On October 19, 2009, Kingdom Living Church (KLC), through Pastor Anthony Ramsey, leased industrial property from LN Real Estate. KLC intended to develop the rundown property into a church facility. The lease was set to expire on January 31, 2015. Ramsey swore in an affidavit that KLC spent $300,000 in the following years to "update, renovate and maintain the property." Ramsey asserted that he frequently spoke to Jenny Testrake at LN about KLC's intent to purchase the property at the end of the lease, explaining why it spent so much to renovate property that it did not own. A rider to the lease also gave KLC the right of first refusal in the event LN decided to sell the property: "In the event Landlord receives a bona fide offer to buy all or any portion of the Premises, and Landlord intends to accept such offer, Landlord shall give Tenant written notice of the offer," identifying the purchase price and offer terms, and allow KLC the opportunity to match the offer within 10 days.

In 2011, LN replaced Testrake and named Audra Brown its point person on the KLC account. KLC was approximately one month behind in its rent obligation and Brown notified

-1-

KLC that if it did not remedy the default, eviction proceedings would be instituted. Brown admittedly did not like Ramsey. She felt he was too "flashy" and that his "fancy suits, expensive watch," and "expensive foreign automobile" were unbefitting his role as a minister. However, neither Testrake nor Brown was the final authority on whether and when to sell the subject property; LN vice president of real estate, Nick Pavelich, was. Pavelich testified that he did not know the denomination of KLC church, or its racial makeup. Pavelich claimed that he never met Ramsey and was unaware of Brown's dislike for him.

Pavelich listed the subject property for sale in August 2014 for $899,000. This was a public listing, which was available to Ramsey. In the following months, LN's agents showed the property to prospective buyers at least nine times, Ramsey claimed. On January 19, 2015, LN real estate broker Paul Saad informed Ramsey that two parties had expressed interest in purchasing the property but had not yet made a formal purchase offer. Accordingly, there were no offers or terms to share with KLC. Ramsey claimed that "Saad made multiple overtures," suggesting that KLC make an offer to LN between $300,000 and $400,000. On January 30, 2015, one day before its lease was set to expire, KLC offered LN $250,000 to purchase the property. LN declined this offer.

Despite that LN declined KLC's purchase offer, the church did not vacate the premises. It then became a holdover tenant. Pursuant to the lease agreement, the holdover lease ran month to month and KLC was required to pay $13,500 monthly in rent. However, KLC paid no rent after January 31. LN filed suit on February 9, 2015, to evict KLC and collect unpaid rents. KLC filed a counter-complaint, accusing LN of breaching the right-of-first-refusal provision of the lease and seeking specific performance. KLC further asserted that LN had been unjustly enriched by the church's improvement of the property and violated the Elliot Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, by discriminating against KLC based on religion and race. LN later added a slander-of-title claim against KLC based on its recording of a lis pendens.

In the months that followed, LN received two offers to purchase the property, one for $400,000 and the other for $700,000. LN rejected both and believed the sale was being hindered by the litigation and KLC's refusal to vacate the premises. As a result, LN sought partial summary disposition in September 2015, seeking an order that it was entitled to immediate possession of the property and payment of rents. LN also sought judgment on its slander-of-title claim. The circuit court granted LN's motion.

In summarily dismissing the action in favor of LN, the court noted that the parties' lease expired on January 31, 2015. Prior to the lease's expiration, LN notified KLC "that it did not wish to extend the lease" and informed KLC "that if it did not vacate the property" on January 31, LN would file an eviction action. KLC did not vacate the premises and suit was initiated. The circuit court applied the plain language of the lease agreement to conclude that LN was "unambiguously entitled to possession of its property" as of January 31, 2015, "unless [KLC] [could] show a valid legal reason that would have extended the lease agreement beyond the expiration date or that it is entitled to current possession."

The circuit court looked first to the right-of-first-refusal rider and determined that it "in no way operate[d] to extend the lease term beyond its January 31, 2015 expiration date." Moreover, no violation of the rider could extend the lease term or defeat LN's right to

possession.  In any event, the court noted that LN's unsuccessful effort to sell the property evidenced that LN "never received an acceptable offer to buy the property" of which it would be required to notify KLC.  And even if LN had breached this provision, KLC would only be entitled to specific performance of the right-of-first-refusal promise, not an extension of its lease.

The court also rejected that KLC's equitable unjust enrichment claim could extend the lease.  The lease provided that KLC was required to keep the property in "good repair" at its own expense and that LN could require KLC to remove "[a]ll alterations, additions or improvements" at the end of the lease.  The lease did not require reimbursement for any improvements left behind.  Ramsey admitted in a letter that KLC "was proceeding in 'an extremely risky and highly unorthodox' manner by improving property that it did not own."  The fact that KLC spent $300,000 updating the property to meet its needs did not extend the lease.

Finally, the court upheld LN's calculation of KLC's outstanding rent and found that KLC's holdover did not extend the lease term.  The lease provided that in the event KLC held over after the expiration of the lease, its base rent would double and the lease would continue on a month-to-month basis.  The parties did not modify the lease or enter a new lease and so KLC became a holdover tenant when it did not vacate the property on January 31.  It was therefore required to pay rent at double the final rate, or $13,500 monthly.  And given that KLC had no right to continued possession, the court concluded that it slandered LN's title by filing a lis pendens.

Discovery continued and on November 24, 2015, LN served a request for admissions upon KLC with a December 22 response deadline.  Relevant to this appeal, LN requested that KLC admit the following:

> **Request to Admit #4:**  [KLC] admits that the Lease . . . ended on January 31, 2015.

> \* \* \*

> **Request to Admit #6:**  [KLC] admits that it became a holdover tenant at [the subject property] starting on February 1, 2015.

> \* \* \*

> **Request to Admit #7:**  [KLC] admits that Provision 23 titled HOLDING OVER of the Lease . . . requires [KLC] to pay LN 200% of Base Rent in effect on January 31, 2015, during any holdover tenancy.

> \* \* \*

> **Request to Admit #8:**  [KLC] admits that it has remained in physical possession of the [subject property] from February 1, 2015, to the present day.

> \* \* \*

**Request to Admit #10:** [KLC] admits that there is no Provision in [the lease agreement] which requires LN to pay [KLC] for any alterations, additions or improvements that [KLC] made to the [subject property].

\* \* \*

**Request to Admit #12:** [KLC] admits that there is no Provision in [the lease agreement] which requires LN to sell the Leasehold Premises to [KLC] unless the LN [sic] receives a bona fide offer to buy all or any portion of the [subject property] and LN intended to accept this offer.

\* \* \*

**Request to Admit #13:** [KLC] admits that it has no admissible evidence in its possession or control which proves that LN received a bona fide offer to buy all or any portion of the [subject property] and LN intended to accept this offer.

\* \* \*

**Request to Admit #16:** [KLC] admits that that it has no admissible evidence in its possession or control which satisfies its burden to prove that LN rejected both of [KLC's] written offers to purchase the [subject property] in violation of the [ELCRA].

\* \* \*

**Request to Admit #19:** [KLC] admits that it has no admissible evidence in its possession or control which supports its claim in paragraph 10 of its Counter-Complaint . . . that "To date, LN has not complied with Lease Section 41.2."

\* \* \*

**Request to Admit #25:** [KLC] admits that its LETTER OF INTENT . . . confirms that [KLC] affirmatively knew that spending money to improve the [subject property] that it did not own was "extremely risky and highly unusual."

\* \* \*

**Request to Admit #27:** [KLC] admits that its alleged ongoing dialogue with LN Realty which supposedly cemented a mutual interest to transform the property and work with [KLC] to purchase the [subject property] as asserted in the . . . AFFIDAVIT OF ANTHONY RAMSEY . . . was never memorialized into a writing signed by both LN and [KLC] at any time.

\* \* \*

-4-

**Request to Admit #30:** [KLC] admits that a buyer allegedly showing increased interest in purchasing the [subject property] . . . due to increased site visits . . . does not trigger [KLC's] right of first refusal contained in the Lease . . . as [KLC's] right of first refusal . . . was only triggered if a bona fide offer to purchase the [subject property] was made to LN and LN intended to accept the same on or before 1/31/15.

* * *

**Request to Admit #31:** [KLC] admits that it has no admissible evidence in its possession to prove that [its] right of first refusal contained in the Lease . . . was triggered since it has no admissible evidence to prove that LN received a bona fide offer to purchase the [subject property] which LN intended to accept on or before 1/31/15.

Before the response deadline, LN filed a motion to summarily dismiss KLC's counterclaims. The court heard the parties' arguments on January 11, 2016, and KLC acknowledged that it had not yet answered LN's request for admissions. The court denied KLC's request to belatedly answer the admissions request and deemed the statements admitted.

The court waited until May 2016 to resolve LN's summary disposition motion, allowing further discovery to proceed. The court subsequently accepted the arguments propounded by LN's counsel in granting its motion. In relation to KLC's right of first refusal, the lease provided that KLC had the right to match an offer made by a prospective purchaser, therefore having the first right to buy the property. LN did not receive an offer it intended to accept, however, so there was no offer for KLC to match. LN received from prospective purchasers two offers and one letter of intent. None were satisfactory and LN did not intend to accept them. It also had no intent to accept KLC's "laughably low" offer of $250,000. Accordingly, KLC could not establish that LN breached the right-of-first-refusal rider and there was no triggering event to order LN's specific performance.

In relation to KLC's claim for remuneration for the renovations to the property, LN argued that KLC could not have equitable or quasi-contractual relief when there was an actual contract. Nothing in the contract required LN to repay KLC for improvements made to the property. And as a real estate transaction, the statute of frauds required any enforceable agreement to repay KLC for improvements to be in writing.

In relation to the ELCRA claim, LN noted that the sole decision-maker regarding the sale of this property, Pavelich, did not know that Ramsey was African-American or the denomination of the church. He simply rejected the purchase offers made by KLC and others because they were too low.

KLC now appeals the circuit court's orders.

## II. REQUEST FOR ADMISSIONS

KLC first challenges the circuit court's order deeming admitted the statements provided in LN's request for admissions. We need not resolve whether the circuit court abused its

discretion in declining KLC's request to file late answers as any potential error was harmless. See MCR 2.613(A) ("An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."). After deeming the statements admitted, the court permitted the parties to conduct discovery. Its later summary disposition judgment was based on the plain language of the lease and the evidence gathered during discovery, not the admissions. Accordingly, no relief is warranted in this regard.

## III. SUMMARY DISPOSITION

KLC also challenges the circuit court's summary dismissal of its counterclaims and judgment in LN's favor on its slander-of-title count.

> We review a trial court's decision on a motion for summary disposition de novo. *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 243; 704 NW2d 117 (2005). . . .
>
> A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).]

## A. SLANDER OF TITLE

We agree with KLC that the circuit court erred in summarily granting judgment in LN's favor on its slander-of-title count. Whether pursued under the common law or under MCL 565.108,[1] a party must prove three essential elements to prevail regarding a claim of slander of

---

[1] MCR 565.108 provides,

> No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land, and in any action brought for the purpose of quieting title to land, if the court shall find that any person has filed a claim for that reason only, he shall award the plaintiff all the costs of such action, including such attorney fees as the court may allow to the plaintiff, and in addition, shall

title: (1) the publication of a "false statement[] that disparaged [the party's] right in property," (2) malice, and (3) special (or pecuniary) damages. *Wells Fargo Bank v Country Place Condo Ass'n*, 304 Mich App 582, 595; 848 NW2d 425 (2014) (quotation marks and citation omitted). Malice is the "crucial element." *Id*. at 596 (quotation marks and citation omitted). The malice must be "express;" it "may not be inferred merely from the filing of an invalid lien," but must be shown by the defendant's knowing filing of "an invalid lien with the intent to cause the plaintiff injury." *Id*. (quotation marks and citation omitted). A party's slander-of-title claim necessarily fails if the alleged publication was made "in good faith, upon probable cause, or was prompted by a reasonable belief that [the defendant] had rights in the real estate in question. . . ." *Glieberman v Fine*, 248 Mich 8, 12; 226 NW 669 (1929).

LN asserted that KLC slandered its title by recording a lis pendens. "Generally, a lis pendens is designed to warn persons who deal with property while it is in litigation that they are charged with notice of the rights of their vendor's antagonist and take subject to the judgment rendered in the litigation." *Richards v Tibaldi*, 272 Mich App 522, 536; 726 NW2d 770 (2006) (quotation marks and citation omitted). KLC filed a notice of lis pendens regarding its counterclaims pursuant to MCL 600.2711, which provides:

> Where a defendant sets up in his answer a counterclaim, upon which he demands an affirmative judgment affecting the title to, or the possession, use or enjoyment of real property, he may file for record a like notice at the time of filing his answer or at any time afterwards before final judgment.

Even assuming that KLC's statement was false, i.e. that it lacked legal cause to record a notice of lis pendens, and that LN suffered special damages, the record does not support summarily awarding judgment to LN. LN has not proved as a matter of law that KLC was motivated by express malice rather than a good-faith or reasonable belief that it was entitled to record a notice of lis pendens. Indeed, the circuit court made no finding of express malice on the record. Viewing the record in the light most favorable to the nonmoving party, a genuine issue of material fact exists as to whether KLC recorded its notice of lis pendens with express malice, precluding summary dismissal in LN's favor.

## B. RIGHT OF FIRST REFUSAL

We discern no error, however, in the dismissal of KLC's request for specific performance of the right-of-first-refusal rider.[2] "[A] party claiming a breach [of contract] must establish (1)

---

> decree that the defendant asserting such claim shall pay to plaintiff all damages that plaintiff may have sustained as the result of such notice of claim having been so filed for record.

[2] To the extent KLC argues that the right-of-first-refusal rider is unenforceable as unconscionable, that argument is meritless.

> In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be

that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014). "[S]pecific performance is an equitable remedy," *Zurcher v Herveat*, 238 Mich App 267, 297; 605 NW2d 329 (1999), and is generally available to enforce "contracts involving the sale of land," *In re Smith Trust*, 480 Mich 19, 26; 745 NW2d 754 (2008).

Viewing the record in the light most favorable to KLC, there is no evidence that Pavelich, the party responsible for selling the property, ever received a bona fide offer that he intended to accept.

> [O]ur primary task in construing a contract . . . is to give effect to the parties' intention at the time they entered into the contract. We determine the parties' intent by examining the language of the contract according to its plain and ordinary meaning. In doing so, we avoid an interpretation that would render any portion of the contract nugatory. [*Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014) (citations omitted).]

KLC contends that the term "intends" in the rider was ambiguous. Contractual ambiguities can be either patent or latent. *Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010). Patent ambiguities appear on the contract's face. *Id*. at 667. "A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning," *Barton-Spencer v Farm Bureau Life Ins Co*, 500 Mich 32, 40; 892 NW2d 794 (2017), or "if two provisions of the same contract irreconcilably conflict with each other," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). A latent ambiguity, on the other hand, "exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Id.* at 668 (quotation marks and citations omitted). We must enforce unambiguous contractual provisions as written. *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005).

Paragraph 41.2 of the lease agreement provides, "In the event Landlord receives a bona fide offer to buy all or any portion of the Premises, and Landlord *intends* to accept such offer, Landlord shall give Tenant written notice of the offer (the 'Notice of Offer')." (Emphasis added.) In context, the plain and ordinary meaning of the phrase "intends to accept" is evident; it

---

> present. Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. [*Clark v DaimlerChrysler Corp*, 268 Mich App 138, 143-144; 706 NW2d 471 (2005) (citations omitted).]

KLC negotiated for a right of first refusal, and LN promptly agreed to grant one. There is no evidence that KLC was unable to reject the rider as drafted or to present LN with alternate language. As such, there was no procedural unconscionability.

is synonymous with "*plans* to accept" or "*means* to accept." As applied to the instant case, this language does not yield more than one reasonable interpretation.

The record evidence indicates that Pavelich is the agent of LN responsible for deciding whether to sell the subject property and for what amount. Both Brown and Pavelich testified that Pavelich never *considered* accepting any offer made on the subject property during the pendency of the original lease term or during KLC's ensuing holdover tenancy because the offers made were too low. KLC presented no conflicting evidence on this point, and Ramsey's "mere conjecture or speculation" that Pavelich *might* have received a bona fide offer that he intended to accept does not constitute evidence that Pavelich *did* receive such an offer. See *McNeil-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016), lv pending 500 Mich 931 (2017) ("Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient."). Because the undisputed evidence indicates that LN never intended to accept any offers to sell the subject property, it was proper for the circuit court to decide, as a matter of law, that KLC's right of first refusal was never triggered.

## C. UNJUST ENRICHMENT

We further discern no error in the circuit court's dismissal of KLC's claims that it made numerous, expensive improvements based on an understanding that it would be allowed to purchase the property or be reimbursed. KLC's unjust enrichment argument is directly contrary to well-settled precedent.

"The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *Bellevue Ventures, Inc v Morang-Kelly Inc, Inc*, 302 Mich App 59, 64; 836 NW2d 898 (2013). "In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied *only if there is no express contract covering the same subject matter*." *Id*. (citation omitted, emphasis added). The parties' had an express lease agreement, which covered the subject of "alterations, additions or improvements." KLC was therefore precluded from asserting any quasi-contractual claim against LN for its retention of the benefits from such alterations, additions, and improvements. The plain contractual language precluded KLC's claim.

## D. ELCRA

Finally, we conclude that remand is necessary for the circuit court to reconsider LN's motion for dismissal of KLC's ELCRA claim under the proper legal standards.

The ELCRA "is remedial and must be liberally construed to effectuate its ends." *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 15; 506 NW2d 231 (1993). MCL 37.2102(1) provides, "The opportunity to obtain . . . housing and other real estate . . . without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status . . . is recognized and declared to be a civil right." MCL 37.2502(1) of the ELCRA prohibits discrimination in real estate transactions, in relevant part, as follows:

A person engaging in a real estate transaction, or a real estate broker or salesman, shall not on the basis of religion, race, color, national origin, age, sex, familial status, or marital status of a person or a person residing with that person:

(a) Refuse to engage in a real estate transaction with a person.

(b) Discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection with a real estate transaction.

(c) Refuse to receive from a person or transmit to a person a bona fide offer to engage in a real estate transaction.

(d) Refuse to negotiate for a real estate transaction with a person.

(e) Represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or knowingly fail to bring a property listing to a person's attention, or refuse to permit a person to inspect real property, or otherwise make unavailable or deny real property to a person.

* * *

(h) Discriminate against a person in the brokering or appraising of real property.

The counter-plaintiff in this case was the church and not its pastor, Anthony Ramsey. This does not change our analysis. MCL 37.2103 defines terms used throughout the act. The statute defines "person" for purposes of the ELCRA as:

an individual, agent, association, corporation, joint apprenticeship committee, joint stock company, labor organization, legal representative, mutual company, partnership, receiver, trust, trustee in bankruptcy, unincorporated organization, the state or a political subdivision of the state or an agency of the state, or any other legal or commercial entity. [MCL 37.2103(g).]

A church fits within this broad and inclusive definition. And LN does not dispute that the events in this case fall within the parameters of a real estate transaction under the act.

The Court of Appeals for the Sixth Circuit considered the proper analysis of a claim under MCL 37.2502 in *Mencer v Princeton Square Apartments*, 228 F3d 631, 634-635 (CA 6, 2000):

Michigan has enacted an analogous fair housing provision, the [ELCRA], on which plaintiffs rely. In interpreting Michigan's fair housing law, we refer to its federal counterpart for guidance. In this Circuit, the same analysis applies to all federal fair housing violations claimed in this case. All turn on the three-part evidentiary standard first developed in the employment discrimination context by *McDonnell Douglas Corp v Green*, 411 US 792, 93 S Ct 1817, 36 L Ed 2d 668 (1973). Courts have adapted this test to fair housing claims by requiring the

-10-

plaintiff to first establish a prima facie case of discrimination.  Then, in response, the defendant must offer a legitimate nondiscriminatory reason for the housing decision made.  Finally, the plaintiff must show that the proffered reason is a pretext that masks discrimination.

* * *

A prima facie housing discrimination case is shown when the plaintiff proves: (1) that he or she is a member of a racial minority, (2) that he or she applied for and was qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter.  Being "qualified to rent" has been defined as "ready and able to accept defendants' offer to rent or buy."  [*Id*. (quotation marks and citations omitted).]

We find this analysis persuasive.  The four prima facie elements for housing discrimination based on race should be applied, with minor modification, to the instant scenario alleging discrimination based on religion[3] in a commercial real estate transaction.  Specifically, the circuit court should consider four elements to determine whether KLC established a prima facie case under MCL 37.2502(1): (1) the "person or a person residing with that person" is a member of a protected class, (2) the "person" asserting the claim was qualified to engage in the contemplated "real estate transaction," (3) with regard to that "real estate transaction," the other "person" engaging in the transaction ("or a real estate broker or salesman") engaged in any of the conduct that is described by MCL 37.2502(1)(a)-(h), and (4) afterward, the contemplated "real estate transaction" remained unconsummated.  As is true with other ELCRA claims, the party alleging discrimination would bear the initial burden of proving a prima facie case by a preponderance of the evidence.  See, e.g., *Lytle v Malady (On Rehearing)*, 458 Mich 153, 177; 579 NW2d 906 (1998).

The circuit court did conduct a burden-shifting analysis under *McDonnell Douglas* but glossed over the statutory elements and did not have the benefit of the proper test to determine whether KLC established a prima facie case.  The circuit court should apply the modified *Mencer* test in the first instance.  Accordingly, we vacate the summary dismissal of KLC's ELCRA claim and remand for further proceedings.

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

---

[3] KLC conceded at oral argument before this Court that there was no evidence that LN discriminated against it based on the race of its pastor or congregants.