*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CLEVELAND STEGALL,

Plaintiff-Appellant,

v

RESOURCE TECHNOLOGY CORPORATION, doing business as BRIGHTWING, and FCA US, LLC,

Defendants-Appellees.

UNPUBLISHED
September 24, 2019

No. 341197
Oakland Circuit Court
LC No. 2016-155043-CD

Before: JANSEN, P.J., and METER and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

Plaintiff Cleveland Stegall worked as an information and communication technology support specialist at defendant Fiat Chrysler Automobile's (FCA) Sterling Heights Assembly Plant (SHAP). FCA terminated Stegall's employment two months after he reported possible asbestos contamination in his workplace and requested air quality testing and safety gear. The majority holds that Stegall's public policy tort claim against FCA fails because he complained only internally, and his asbestos concerns ultimately proved groundless. Stegall's claim under the Whistleblower's Protection Act (WPA) meets a similar fate. According to the majority, Stegall failed to present evidence of any causal connection between his subsequent complaint about the asbestos situation to the Michigan Occupational Safety and Health Administration (MiOSHA) and his termination by Brightwing, a staffing agency. I respectfully dissent from both holdings.

## I. PUBLIC POLICY TORT

In *Suchodolski v Mich Consolidated Gas Co*, 412 Mich 692, 694-695; 316 NW2d 710 (1982), our Supreme Court held that even though an at-will employee is subject to termination at any time and for no stated reason, "some grounds for discharging an employee are so contrary to public policy as to be actionable." A handful of Michigan statutes create causes of action rooted in public policy, including the Civil Rights Act, MCL 37.2701 *et seq.*, and the People with Disabilities Civil Rights Act, MCL 37.1602 *et seq.* In *Suchodolski*, the Supreme Court identified

several common-law grounds for a public policy claim: discharge for "failure or refusal to violate a law in the course of employment," or for exercising a well-established statutory right. *Id*. at 695-696. *Suchodolski*'s "enumeration of 'public policies' that might forbid termination of at-will employees was not phrased as if it was an exhaustive list." *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 573; 753 NW2d 265 (2008).

The public policy involved in this case flows from federal laws protecting the rights of workers to express concerns about possible exposure to asbestos, and to demand air quality testing to allay those concerns. Asbestos was once a ubiquitous insulation material. In the 1970s, it was determined to be a carcinogen. See Asbestos, Report on Carcinogens (14th ed), available at <https://ntp.niehs.nih.gov/ntp/roc/content/profiles/asbestos.pdf> (accessed September 16, 2019).[1] The serious health risks caused by airborne asbestos fibers are now well recognized. According to the National Institute for Occupational Safety and Health, "Persons occupationally exposed to asbestos have developed several types of life-threatening diseases, including asbestosis, lung cancer and mesothelioma." Asbestos, The National Institute for Occupational Safety and Health, Center for Disease Control and Prevention, available at <https://www.cdc.gov/niosh/topics/asbestos/default.html> (accessed September 16, 2019).

Federal law explicitly recognizes the occupational risks posed by airborne asbestos fibers:

> Asbestos exposure in general industry occurs in a wide variety of industrial and commercial settings. Employees who manufacture asbestos-containing products may be exposed to asbestos fibers. Employees who repair and replace automotive brakes and clutches may be exposed to asbestos fibers. In addition, employees engaged in housekeeping activities in industrial facilities with asbestos product manufacturing operations, and in public and commercial buildings with installed asbestos containing materials may be exposed to asbestos fibers. [29 CFR 1910.1001(j) (2016).]

The Occupational Health and Safety Administration (OSHA) has promulgated air quality standards prohibiting exposure to "an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average." 29 CFR 1910.1001(c)(1) (2016). If FCA had actually conducted air quality monitoring in the penthouse, it was obligated to share the results with Stegall:

> The employer must, within 15 working days after the receipt of the results of any monitoring performed under this sections [sic], notify each affected employee of these results either individually in writing or by posting the results in an appropriate location that is accessible to affected employees. [29 CFR 1910.1001(d)(7)(i) (2016).]

---

[1] Other health dangers caused by exposure to asbestos were known far earlier. See *Olivo v Owens-Illinois, Inc*, 186 NJ 394, 404, 895 A2d 1143 (2006).

Here are the "Worker Rights" described in an OSHA Fact Sheet regarding asbestos:[2]

> **Worker Rights**
>
> Workers have the right to:
>
> - Working conditions that do not pose a risk of serious harm.
> - Receive information and training (in a language and vocabulary the worker understands) about workplace hazards, methods to prevent them, and the OSHA standards that apply to their workplace.
> - Review records of work-related injuries and illnesses.
> - Get copies of test results that find and measure hazards.
> - File a complaint asking OSHA to inspect their workplace if they believe there is a serious hazard or that their employer is not following OSHA's rules.
> - OSHA will keep all identities confidential.
> - Exercise their rights under the law without retaliation or discrimination.
>
> For more information, see OSHA's workers page.

These federal statutes and regulations reflect that airborne asbestos poses serious risks to workers, and embody objective public policies intended to safeguard the physical and mental health of workers potentially exposed to asbestos.

Stegall's evidence in opposition to summary disposition must be viewed against this regulatory backdrop. I turn to a review of that evidence, primarily drawn from deposition testimony and, along with all reasonable inferences, presented in the light most favorable to Stegall. *Craig v Oakwood Hosp*, 471 Mich 67, 77; 684 NW2d 296 (2004).

Stegall worked for both FCA and Brightwing, a staffing agency that provided Stegall to FCA in 2013. In April 2016, Stegall became concerned about possible exposure to asbestos dust when he and two colleagues were assigned to work in "the penthouse" of FCA's SHAP. During a meeting with two supervisors, Stegall complained that he and his two coworkers developed respiratory symptoms (coughing with bloody mucous and itchy, watery eyes) after working in the penthouse. On April 28, 2016, Stegall sent the following email to his immediate supervisor, Jim Scarpace, Scarpace's supervisor, Richard Spondike, first-shift IT supervisor Mitul Patel, and a coworker:

> These are just three (3) IDF examples of what we have to contend with during the cleaning. This doesn't even include the paths or walkthroughs areas (air exchange, heating and ventilations areas) on getting to the IDFs, which have the same issues. Mind you, the pictures attached are not the worst offenders, but the ones we could immediately take shots of.

---

[2] OSHA FactSheet, available at <https://www.osha.gov/Publications/OSHA3507.pdf> (accessed September 16, 2019).

A lot of the pipes are damaged, material falling out above head, and dust/material around these areas.

*We would like to be provided with the necessary personal protective equipment on handling these areas where asbestos pipes are exposed and damage [sic]. And some type of guarantee these items will protect our health.*

These issues were brought up in the past[] because of sickness that has occurred amongst a few ICT workers cleaning IDFs within the upper TCF substations. *We want to make sure our long term health isn't being affected by the dust/particles within these areas.*

FYI: The picture of my shoes is from a 10-15 minute walk within these areas. It's that bad. [Emphasis added.]

Stegall attached photographs depicting overhead pipes and insulation. Some of the pipes display a "DANGER" warning stating, "CONTAINS ASBESTOS FIBERS AVOID CREATING DUST CANCER AND LUNG DISEASE HAZARD." Based on the readily visible warning combined with his respiratory symptoms and the dust collecting on his shoes, Stegall reached the logical conclusion that the penthouse might be contaminated with airborne asbestos.

Spondike forwarded Stegall's photos (without the accompanying text) to an employee health and safety manager, who in turn forwarded them to an outside consultant, John Pomroy. Based only on the photos, Pomroy opined that there was nothing to worry about; although there were asbestos-wrapped pipes in the penthouse, he explained, it appeared that only fiberglass-wrapped pipes were damaged. This information was not shared with Stegall. Instead, Spondike provided Stegall and his coworkers with respiratory masks to use when they worked in the penthouse. Stegall was informed that FCA would obtain air quality testing to verify the safety of that area.

After receiving the protective gear and the reassurance that testing had been ordered, Stegall went on vacation. When he returned on May 16, the masks were gone. Stegall asked for replacements, but none were provided. He was given no explanation for this. Shortly after Stegall's renewed request for reassurance about possible asbestos exposure, Spondike had decided to terminate Stegall's FCA employment effective June 17. FCA had decided to temporarily shut down production at the Sterling Heights site beginning in June. However, in February, Spondike had informed a representative of ZeroChaos, a staffing agency, that he wanted to retain Stegall; Spondike was aware of the impending shut down at the time of their conversation.[3] Before his termination, Stegall had been advised by Spondike that if employment needs changed at SHAP, he would be transferred to a different plant. Stegall was never given any reason for his termination, and no documentary evidence of record explains why FCA

---

[3] ZeroChaos offers "workforce solutions" to FCA, managing the process of hiring "supplemental" employees. Stegall was employed by an agency called Brightwing, which supplied his résumé to ZeroChaos. ZeroChaos helped place Stegall at FCA.

released him from employment. Stegall was the only employee in his department whose employment ended. And Spondike admitted that FCA hired someone to replace Stegall.

During the week of June 13, Stegall asked Scarpace about the status of the air quality testing. Scarpace indicated that he had not yet seen it. In response to Stegall's persistent follow-up questioning, Scarpace stated that he did not know when the testing results would be available. At some time during that week, Stegall threatened to "go to OSHA." Stegall was officially released from employment with FCA on June 17. Stegall filed a discrimination complaint with MiOSHA and against Brightwing on July 6. Brightwing terminated him on August 3.

The majority rejects Stegall's public policy/wrongful discharge claim for two reasons: "there is no Michigan caselaw extending the public policy exception to discharges in retaliation for internal reporting of alleged violations of the law," and no facts support that FCA "wrongfully terminated plaintiff in retaliation for his refusal to violate the law because here is no evidence that anyone actually violated any law or regulation." Respectfully, the majority has misconstrued both the facts and the law.

A. "Internal" Reporting

The majority's claim that no Michigan caselaw extends the public policy exception to "internal reporting of alleged violations of the law" is simply incorrect. In *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 521-522; 854 NW2d 152 (2014), the plaintiff, a licensed practical nurse, asserted that

> he was terminated because he reported negligence by a coworker, which negligence he believed directly led to the death of a patient, to a supervisor. Plaintiff alleged that after he reported the believed negligence, he was retaliated against by defendant and the retaliation ultimately culminated in his termination. In his complaint against defendant, plaintiff alleged wrongful discharge in violation of public policy.

A jury found in the plaintiff's favor, and this Court affirmed. We held that the plaintiff could premise his public policy claim on violations of Michigan's Public Health Code, MCL 333.1101 *et seq*., explaining:

> In enacting MCL 333.20176a, the Legislature clearly expressed a desire to further that policy by prohibiting retaliation against an employee who reports malpractice. And the right to report alleged acts of negligence (malpractice) is consistent with and implicit in the purposes of the Public Health Code and its statutory regulations governing health care professionals. [*Landin*, 305 Mich App at 530.]

Thus, the majority's first reason for rejecting Stegall's public policy claim is legally incorrect, as caselaw *does* support that a claim made only internally may proceed. In *Landin*, the plaintiff's internal communication about medical malpractice gave rise to a public policy claim because the Public Health Code is designed to protect the public from "incompetence, deception, and fraud." *Id*. Stegall's expressions of concern about possible asbestos exposure and his

-5-

demand for air quality testing are "consistent with and implicit in the purposes of" multiple federal asbestos regulations. *Id*.

Prohibiting a public policy claim because a complaint was only "internal" makes no logical sense, either, because if Stegall had complained *externally*, he could not bring a public policy case at all.

It is well established that an aggrieved plaintiff may not bring a public policy claim for wrongful discharge if the plaintiff has an actionable claim under the WPA, MCL 15.361 *et seq*. *McNeil-Marks v MidMich Med Ctr-Gratiot*, 316 Mich App 1, 26; 891 NW2d 528 (2016). The WPA provides a cause of action to employees who report violations or suspected violations of the law to public bodies. MCL 15.362. A private company such as FCA is not a public body. Logically, if Stegall reported FCA's suspected violation of asbestos laws to an outside entity, that entity would have been a public body. By making an "outside" complaint Stegall would have gained a claim under the WPA, but lost a public policy cause of action. Therefore, it makes no sense to forbid "internal" public policy claims, as once a claim is made externally, a plaintiff's public policy claim evaporates.

### B. An Actual Legal Violation

Nor do I agree with the majority that Stegall's claim fails because "there is no evidence that anyone actually violated any law or regulation." Whether a law was actually broken is irrelevant to an action based on a public policy theory.

*Suchodolski*, 412 Mich at 695-696, posits that a cause of action may be implied when an employee fails or refuses to violate a law in the course of employment, or exercises "a right conferred by a well-established legislative enactment." Federal law, codified in 29 CFR 1910.1001(c) (1) (2016), establishes an employee's right to work in a location free of airborne asbestos in a concentration in excess of 0.1 fiber per cubic centimeter of air as an eight-hour time weighted average. 29 CFR 1977.9(c) (2016) proclaims that workers should not be penalized for complaining in good faith about asbestos exposure:

> Further, the salutary principles of the Act would be seriously undermined if employees were discouraged from lodging complaints about occupational safety and health matters with their employers. . . . Such complaints to employers, if made in good faith, therefore would be related to the Act, and an employee would be protected against discharge or discrimination caused by a complaint to the employer.

These regulations express a public policy protective of workers who complain or communicate concern about the possible presence of asbestos in a workplace. They envision that an employer will not retaliate when a worker seeks information or reassurance that a workplace is free from

dangerous asbestos fibers. Whether a dangerous concentration of asbestos actually exists is irrelevant.[4]

In my view, Stegall has set forth a prima facie case under a public policy tort theory. His conduct was consistent with having exercised his right to an asbestos-free environment. Encouraging workers to report potential occupational health hazards without fear of discharge furthers the public policy of protecting lives and health, regardless of whterh a dangerous level of asbestos actually is found.

## II. THE WPA CLAIM AGAINST BRIGHTWING

Stegall was employed jointly by Brightwing and FCA. On June 18, a Brightwing representative, Kerri Kacanowski, telephoned Stegall and informed him that his employment at FCA had been terminated. Stegall told Kackanowski that he had complained about asbestos contamination to FCA management. She made a note in his record memorializing their conversation about asbestos.

Kacanowski advised Stegall to update his résumé and that Brightwing would search for another assignment for him. He mentioned MiOSHA to Kacanowski during the June 18 telephone conversations, and recounted his awareness that FCA planned to close SHAP. He also informed Kacanowski that in April or May 2016, Spondike and Scarpace had informed him that he would be reassigned to third shift at Sterling stamping.

On July 6, 2016, Stegall filed a discrimination complaint with MiOSHA. Staff from MiOSHA investigated plaintiff's complaint and inspected SHAP. The inspection resulted in "no citations." In August, Stegall received paperwork from Brightwing indicating that his employment with the agency was over. Kacanowski admitted that she was aware of Stegall's MiOSHA complaint and had sought additional information about it.

The majority holds that Stegall's WPA claim against Brightwing fails because Stegall cannot demonstrate a causal connection between his report to MiOSHA and his termination from Brightwing's employment. According to the majority, Stegall produced "nothing more than temporal proximity between his protected activity and his alleged discharge," which is not enough to establish a WPA claim.

I take issue with the majority's implied assertion that temporal proximity, standing alone, cannot establish the causation element of a prima facie case. In *Mickey v Zeidler Tool & Die Co*,

---

[4] "Reporting a '*suspected* violation of a law' is protected activity" under the WPA. *Debano-Griffin v Lake Co*, 486 Mich 938; 782 NW2d 502 (2010) (emphasis added). Logically, the same rule should apply to the public policy exception. "[P]ublic-policy claims are analogous to claims made under § 2 of the [WPA], MCL 15.362, and . . . the WPA is analogous to antiretaliation provisions of other employment-discrimination statutes." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 453; 750 NW2d 615 (2008).

516 F3d 516, 525 (CA 6, 2008), the Sixth Circuit held that temporal proximity *can* stand alone in certain cases:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.
>
> The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action. [Citation omitted.]

This Court has reached the same conclusion:

> Close timing between alleged protected activity and the termination of a plaintiff's employment may establish the "causal connection" element of a plaintiff's prima facie case of retaliation, and "[t]he proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory [here, retaliatory] basis." [*Taylor v Modern Engineering, Inc*, 252 Mich App 655, 661; 653 NW2d 625 (2002) (alterations in original), quoting *Town v Mich Bell Tel Co*, 455 Mich 688, 697; 568 NW2d 64 (1997).]

Here, Stegall complained to MiOSHA on July 6, 2016, Brightwing received a copy of the complaint on July 14, 2016, and on August 3, 2016, Brightwing communicated to Stegall that he was no longer employed with the agency. Notably, nothing relevant to Stegall's qualification for continued employment occurred in between these events that could have supplied any cause for Stegall's termination. Under the circumstances presented in this case, a jury could reasonably conclude that based on temporal proximity alone, Brightwing retaliated against Stegall's filing of a MiOSHA complaint.

Additional evidence of record enhances Stegall's causation argument. Stegall's employment record with Brightwing was entirely favorable. It included a letter of recommendation from a supervisor at FCA highly praising Stegall's work and abilities ("Mr. Stegall is an excellent team member and always puts the team's goals and objectives as a high priority. He works well with his coworkers and helps develop an environment of teamwork and high team performance."). Before Stegall made the MiOSHA complaint, Kacanowski had promised that Brightwing would find him another job. And Brightwing presented no evidence

that it released Stegall for any specific reason, or that he was unfit for future assignments. I would hold that this circumstantial evidence, combined with the temporal proximity between the complaint and the adverse employment action, more than suffices to create a jury question regarding causation.


/s/ Elizabeth L. Gleicher