*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

RAYSHAWN PACE,

        Plaintiff-Appellee,

and

GET WELL MEDICAL TRANSPORT
COMPANY,

        Intervening Plaintiff-Appellee,

and

AFFILIATED DIAGNOSTICS OF OAKLAND,
LLC,

        Intervening Plaintiff,

v

JOHN DOE, ANGELA NOEL, and HOME-
OWNERS INSURANCE COMPANY,

        Defendants,

and

AUTO-OWNERS INSURANCE COMPANY,

        Defendant-Appellant.

RAYSHAWN PACE,

        Plaintiff-Appellee,

and

UNPUBLISHED
October 8, 2019

Nos. 339777; 341409
Wayne Circuit Court
LC No.   15-006548-NI

-1-

GET WELL MEDICAL TRANSPORT
COMPANY and AFFILIATED DIAGNOSTICS
OF OAKLAND, LLC,

    Intervening Plaintiffs,

v               No. 341565
                  Wayne Circuit Court
JOHN DOE, ANGELA NOEL, and HOME-  LC No. 15-006548-NI
OWNERS INSURANCE COMPANY,

    Defendants,

and

AUTO-OWNERS INSURANCE COMPANY,

    Defendant-Appellant.

_____

Before: RIORDAN, P.J., and K. F. KELLY and CAMERON, JJ.

PER CURIAM.

These consolidated appeals arise out of a no-fault case involving first- and third-party claims. In Docket No. 339777, defendant Auto-Owners Insurance Company ("Auto-Owners") appeals as of right the trial court's judgment, following a jury trial, in favor of plaintiff, Rayshawn Pace, and intervening plaintiff, Get Well Medical Transport Co ("Get Well").[1] In Docket No. 341409, Auto-Owners appeals as of right the trial court's order awarding no-fault and case evaluation sanctions to Get Well. In Docket No. 341565, Auto-Owners appeals as of right the trial court's order awarding no-fault and case evaluation sanctions to plaintiff. We reverse the trial court's order denying summary disposition, vacate the court's judgment for plaintiff and Get Well, vacate the court's orders awarding no-fault and case evaluation sanctions to these parties, and remand for entry of an order granting Auto-Owners summary disposition.

## I. FACTUAL BACKGROUND

This case arises out of a July 4, 2014 automobile accident involving plaintiff, who was insured by Auto-Owners. Plaintiff claimed that he was injured in the accident and later sued

---

[1] Defendant Home-Owners Insurance Company was dismissed by stipulation below, and intervening plaintiff Affiliated Diagnostics of Oakland, LLC, evidently agreed to be dismissed as a party before trial.

Auto-Owners for personal protection insurance (PIP) benefits, including replacement-services benefits. Auto-Owners eventually moved for summary disposition under MCR 2.116(C)(10), relying on a fraud-exclusion clause in the no-fault policy of insurance between it and plaintiff. Specifically, Auto-Owners cited "Part F" of the no-fault policy, which is captioned "GENERAL PROVISIONS," and contains a general fraud-exclusion clause, as follows:

**FRAUD**

> We do not provide coverage for any "insured" who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy.

Auto-Owners argued that plaintiff had both made fraudulent statements and engaged in fraudulent conduct in connection with the PIP benefits for which he sought coverage in this action, thereby voiding his coverage under the policy entirely. In support, defendants presented numerous exhibits, including a copy of the no-fault policy, plaintiff's response to Auto-Owners' interrogatories, a transcript of plaintiff's deposition, a judgment of sentence indicating that plaintiff's purported replacement service provider, Meia Carter, had been convicted by guilty plea of one count of insurance fraud, MCL 500.4511(1),[2] a calendared diary of the household replacement services (the "RS diary") that Carter had purportedly provided for plaintiff from July 2014 through December 2014, which was signed by Carter and produced by plaintiff in response to Auto-Owners' request for interrogatories, a transcript of Carter's deposition, and a weather-data sheet prepared by the National Oceanic and Atmospheric Administration (NOAA) showing the measured precipitation levels in Detroit during July and August 2014.

With regard to that last exhibit, the weather-data sheet, Auto-Owners cited the fact that it showed no snow accumulations in Detroit during July or August 2014, which belied the entry in the RS diary indicating that Carter had performed snow-shoveling services for plaintiff at his Detroit home on August 2, 2014. Auto-Owners also highlighted the fact that plaintiff had produced the RS diary in response to its interrogatories, which requested documentation of the "actual" replacement services that had been provided to plaintiff.[3] Plaintiff signed the response to Auto-Owners' interrogatories directly under the attestation, "I AFFIRM THAT THE STATEMENTS ABOVE ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF."

Auto-Owners also noted that the RS diary indicated that Carter had provided replacement services for plaintiff on every date from August 1, 2014 through December 31, 2014, except for December 27, 2014. This was primarily consistent with plaintiff's deposition testimony that

---

[2] It is unclear from the record whether Carter's plea concerned the alleged fraud in this case or in some other insurance matter.

[3] At his deposition, plaintiff admitted that he had "seen" the RS diary, signed the calendar of services performed (that was prepared by Carter) each month, and gave the diary to his attorney to produce in response to Auto-Owners' interrogatories.

Carter was "over every day," beginning approximately one week after the July 4, 2014 accident. In her deposition, however, Carter provided the following answers in response to questions concerning her visits to plaintiff's home:

*Q*. And can you tell me how frequently were you going over to his house to help out?

*A*. Oh, every day. And then about in December, I missed a few days. November, around the holidays, I would go by there for a minute. Maybe miss one or two days, two, three days. But mainly every day.

*Q*. So seven days a week from within 48 hours after the accident through November every day? Did you ever miss a day?

*A*. Yeah. I probably missed a day or two, yeah.

*Q*. Is that one or two days a week or one or two days a month?

*A*. Like out of the month.

*Q*. Okay. So from July through November, you may not have helped him one or two days per month.

*A*. Yeah, a couple days roughly. I don't remember the exact, but I know I missed a couple of days because whatever reasons.

*Q*. And then in December you said because of the holidays, you missed a few days?

*A*. Yeah. I didn't go much in December.

*Q*. I think you said—first you said one to two days, maybe two to three days—

*A*. Well, in December it was more—it was the holidays and winter break. My kids was out of school.

*Q*. Okay. Can you estimate how many days you were unable to assist him during December?

*A*. Maybe one or two. It wasn't every day around the holidays. I don't know.

*Q*. Well, at first you—

*A*. December, Christmas Eve.

*Q*. Okay.

-4-

*A*. Christmas Eve maybe. Of course I didn't go Christmas.

*Q*. And then you said—

*A*. New Year's, New Year's Eve. Like a lot of the holidays. I missed a couple of days and maybe at the beginning. It wasn't that many. I don't remember. Honestly, I don't remember.

*Q*. Okay. And when we're talking about December, we're talking about December of 2015 [sic[4]]. Just three months, two or three months ago, right?

*A*. Right.

Auto-Owners also highlighted the fact that the RS diary indicated that Carter had provided "[c]hild care" services for plaintiff on three distinct dates in October, November, and December 2014. Contrastingly, plaintiff had testified at his deposition that, "after the accident," he had been unable to see his sole child, a daughter, unless her mother (plaintiff's ex-girlfriend) brought the child to his home to visit. Plaintiff indicated that his ex-girlfriend "always" stayed throughout the child's entire visit, then took her home, further indicating that plaintiff could not "keep her on [his] own." When asked whether he was "able to pick her up," plaintiff replied, "No."[5] Likewise, when asked about childcare services at her deposition, Carter largely denied having provided such services:

*Q*. Did you ever help babysit any of his children?

*A*. I don't remember. I don't think—no. I don't think so.

*Q*. Do you know how many children he has?

*A*. One.

\* \* \*

*Q*. So you did or you did not watch—

*A*. I've seen her [i.e., plaintiff's daughter] over there a few times; but no, I don't—uh-uh. I don't watch her.

---

[4] Without prompting, Carter later corrected that she had been referring to events in 2014, not 2015.

[5] Notably, in context, this question seemingly inquired whether plaintiff was able to go "pick up" his daughter at a different *location* (such as the ex-girlfriend's house), not to whether plaintiff was able to physically lift his daughter up off the ground.

Auto-Owners also presented the trial court with surveillance footage of plaintiff taken on two different dates during November 2014, i.e., about four months after the accident.

In response to Auto-Owners' motion, while conceding that the trial court likely "could find fraud in multiple statements that [Carter had] made in this case," plaintiff's counsel argued that seeming fraud perpetrated by Carter was not attributable to *plaintiff*. Plaintiff also argued that the alleged misstatements were not "material," in that they regarded only a small fraction of the total dollar amount of PIP benefits at issue in the case. And plaintiff argued that, in any event, the question whether he or Carter had the requisite intent to defraud Auto-Owners—as opposed to simple lapses in memory or mistakes in filling out the RS diary—was an issue of fact that rested on credibility determinations, which could only properly be resolved by the trier of fact.

The trial court denied Auto-Owners' motion for summary disposition. The case subsequently went to trial, and at the close of proofs, Auto-Owners moved for a directed verdict, largely raising the same fraud arguments that it had raised on summary disposition. The trial court denied Auto-Owners' motion for a directed verdict. The jury subsequently returned a verdict in favor of plaintiff and Get Well.[6] This appeal ensued.

## II. ANALYSIS

We review de novo the trial court's rulings concerning Auto-Owners' motions for summary disposition and a directed verdict. See *Foreman v Foreman*, 266 Mich App 132, 135; 701 NW2d 167 (2005). A motion for summary disposition pursuant to MCR 2.116(C)(10)

> tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016). "This Court is

---

[6] Notably, Carter did not appear at trial, evading service of the subpoena that Auto-Owners attempted to serve on her numerous times.

liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

Any defense asserting "that an instrument or transaction is void" or "voidable" is an affirmative defense. MCR 2.111(F)(3); *McCracken v Detroit*, 291 Mich App 522, 528; 806 NW2d 337 (2011). Therefore, "[r]eliance on an exclusionary clause in an insurance policy is an affirmative defense," and the defendant insurer bears the burden of proof concerning it. *Shelton v Auto-Owners Ins Co*, 318 Mich App 648, 657; 899 NW2d 744 (2017). Practically speaking, this means that for the no-fault insurer to obtain summary disposition under MCR 2.116(C)(10) by reliance on a fraud-exclusion clause, it "must show that there is no question of material fact as to any of the elements of its affirmative defense." *Id*.

As this Court recognized in *Rayis v Shelby Mut Ins Co of Shelby, Ohio*, 80 Mich App 387, 391-392; 264 NW2d 5 (1978), there is a distinction between the defenses of "fraudulent procurement of the insurance policy" (i.e., fraud that induced the insurer to *issue* the insurance contract in the first instance) and "fraudulent proof of loss" (also known as "false swearing"), which occurs *after* the policy is issued. With regard to the latter defense, in *Mina v Gen Star Indemnity Co*, 218 Mich App 678, 686; 555 NW2d 1 (1996), rev'd in part on other grounds 455 Mich 866 (1997), this Court observed:

> The insurer's defense of "false swearing" is an allegation that the insured submitted fraudulent proof of loss. Fraud or false swearing implies something more than mistake of fact or honest misstatements on the part of the insured. It may consist of knowingly and intentionally stating upon oath what is not true, *or stating a fact to be true although the declarant does not know if it is true and has no grounds to believe that it is true*. In order to prevail, the insurer must prove not only that the swearing was false, but also that it was done knowingly, wilfully, and with intent to defraud. Fraud cannot be established from the mere fact that the loss was less than was claimed in the preliminary proofs furnished to the insurer. [Emphasis added.]

The defense at issue here is false swearing—Auto-Owners does not contend that plaintiff made fraudulent misrepresentations that induced Auto-Owners to issue the no-fault policy in the first place. The essential elements of the "false swearing" defense are enumerated in *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 424-425; 864 NW2d 609 (2014), as follows:

> To void a policy because the insured has wilfully misrepresented a material fact, an insurer must show that (1) the misrepresentation was material, (2) that it was false, (3) *that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth*,[7] and (4) that the insured

---

[7] In the trial court, plaintiff relied on *West v Farm Bureau Mut Ins Co of Mich*, 402 Mich 67, 69; 259 NW2d 556 (1977), for the proposition that "[w]here an insurance policy provides that an insured's concealment, misrepresentation, fraud, or false swearing voids the policy, the insured must have *actually intended to defraud* the insurer," which might, at first blush, appear to be at

made the material misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim. [Quotation marks and citation omitted; emphasis added.]

Initially, we conclude that the approximate eight minutes of surveillance video footage that Auto-Owners produced is unpersuasive as evidence of false swearing to establish entitlement to summary disposition under MCR 2.116(C)(10). In our estimation, the footage is not so inconsistent with plaintiff's deposition testimony that reasonable minds would necessarily agree that plaintiff committed false swearing.[8]

Nevertheless, we conclude that Auto-Owners was entitled to judgment as a matter of law on the basis of other evidence that it presented, which left no genuine issue of material fact concerning each element of its false swearing defense. The first element (i.e., materiality) was satisfied because the alleged misrepresentations regarded services that plaintiff claimed that he had received as necessary replacement-services benefits. In other words, the misrepresentations were directly relevant to Auto-Owners' investigation of plaintiff's claim for PIP benefits. Nor was there any genuine factual dispute concerning the second element: falsity. Plaintiff openly admitted that at least some of the requested replacement services—including the midsummer snow shoveling—were never actually needed or provided. Likewise, it seems clear that there was no genuine issue of material fact concerning the fourth element (i.e., that plaintiff made the representations in question intending that Auto-Owners would act upon them). Plaintiff specifically requested reimbursement for the services listed in the RS diary, thereby plainly demonstrating his intent for Auto-Owners to act in reliance on its contents.

The determinative question concerns the third element, namely, whether the disputed misrepresentations to Auto-Owners were false (at the time they were made) or were made recklessly, without any knowledge of whether they were true. In our estimation, reasonable minds could not differ on this point.

During discovery, when plaintiff was served with interrogatories that included a request for him to produce "any and all diaries, worksheets, affidavits, or other documentary evidence setting forth the *actual* [replacement] services performed for" him, plaintiff responded by

---

odds with *Bahri*'s statement of the requisite intent element for false swearing. (Emphasis added.) However, *West* involved a policy of fire insurance that was governed by former MCL 500.2832 (repealed by 1990 PA 305), which once set forth "The Michigan Standard Fire Insurance Policy," *Allen Park Theatre Co, Inc v Mich Millers Mut Ins Co*, 48 Mich App 199, 204; 210 NW2d 402 (1973). In other words, before its repeal, former MCL 500.2832 "statutorily mandated" the terms of all fire insurance policies in this state. *State Farm Fire & Cas Co v Farmers Ins Exch*, 80 Mich App 567, 571; 264 NW2d 62 (1978). Hence, *West* is legally distinguishable from the instant no-fault case.

[8] Indeed, viewing plaintiff's deposition testimony in context, when he indicated that he was not "able to pick [his daughter] up," it seems he likely meant that he was unable to drive or walk to pick her up at a different *location*, not that he was physically unable to lift her.

producing the RS diary. (Emphasis added.) Plaintiff signed his response to the discovery request directly under the attestation, "I AFFIRM THAT THE STATEMENTS ABOVE ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF." Moreover, as required by MCR 2.302(G)(1), plaintiff's trial counsel signed that discovery response as well. Under MCR 2.309(B)(1), "[e]ach interrogatory must be answered separately and fully in writing under oath." "A party must include in its answers . . . 'such information as is available to the party served or that the party could obtain from his or her employees, agents, representatives, sureties, or indemnitors.' " *Frankenmuth Mut Ins Co v ACO, Inc*, 193 Mich App 389, 398; 484 NW2d 718 (1992), quoting MCR 2.309(B)(1).

Considering the evidence submitted on summary disposition, reasonable minds could not differ that plaintiff presented the RS diary to Auto-Owners either knowing that at least some of the entries in the diary were false or with reckless disregard as to falsity. As the parties acknowledged below, a cursory review of the RS diary reveals the entry indicating that Carter performed snow-shoveling services for plaintiff at his Detroit home on August 2, 2014. Indeed, in his response to Auto-Owners' motion for summary disposition, plaintiff admitted that the snow-shoveling entry was just as false as it was *obviously* false, arguing:

> Can anyone believe that someone attempting to defraud an insurance company would indicate she shoveled snow in August? . . . . Only an idiot would suggest that. When is the last time it snowed in Michigan in August? **GIVE ME A BREAK! NOT ONLY IS THE SERVICE PROVIDER** [i.e., Carter] **ALLEGEDLY A FRAUD; SHE IS A STUPID FRAUD**.

Plaintiff failed to recognize that by that same logic, he must have either submitted the RS diary to Auto-Owners recklessly—without reviewing the entries to determine whether they were accurate—or knowing that at least one of them was patently unbelievable.

We reach a similar conclusion with regard to the entries in the RS diary indicating that Carter had provided childcare services for plaintiff on three distinct dates in October, November, and December 2014. Carter's deposition testimony on that point was initially somewhat noncommittal, but she ultimately answered, "[N]o, I don't—uh-uh. I don't watch [plaintiff's sole child]." Likewise, plaintiff testified that, "after the accident," he had been unable to see his daughter unless his ex-girlfriend brought the girl to his home to visit. Plaintiff indicated that his ex-girlfriend "always" stayed throughout the daughter's entire visit, then took her home, indicating that plaintiff could not "keep her on [his] own." Such testimony squarely contravened the RS diary's entries regarding childcare services, and after Auto-Owners produced such evidence in favor of summary disposition, plaintiff failed to produce any substantively admissible evidence to create a genuine issue of material fact on this point.

In sum, on the basis of the evidence presented at summary disposition, there was no genuine issue of material fact that plaintiff presented the RS diary to Auto-Owners for payment either recklessly or with knowledge that at least some of its entries were false. Nor was there any genuine issue of material fact concerning the other elements of Auto-Owners' false swearing

defense. Moreover, to the extent that the intervening plaintiff medical providers somehow had standing to pursue their third-party claims in this action in the first instance,[9] because they "stood in the shoes of the named insured, if plaintiff cannot recover benefits, neither can intervening plaintiffs." See *Bahri*, 308 Mich App at 424. Therefore, the trial court erred by failing to grant Auto-Owners summary disposition of all claims in this action under MCR 2.116(C)(10). Accordingly, we reverse the trial court's order denying summary disposition, vacate its subsequent judgment and orders awarding no-fault and case evaluation sanctions,[10] and remand for entry of an order granting Auto-Owners summary disposition under MCR 2.116(C)(10).[11]

Reversed in part, vacated in part, and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Thomas C. Cameron

---

[9] In any event, Auto-Owners is also entitled to judgment as a matter of law with regard to the medical providers' claims under a retroactive application of *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191; 895 NW2d 490 (2017), which is appropriate here because Auto-Owners preserved the *Covenant* issue in the trial court, *VHS Huron Valley Sinai Hosp v Sentinel Ins Co*, 322 Mich App 707, 714; 916 NW2d 218 (2018), lv pending.

[10] Because Auto-Owners was not liable to pay no-fault benefits to plaintiff or Get Well, the trial court erred by awarding these parties no-fault sanctions under MCL 500.3148(1), and by awarding case evaluation sanctions under MCR 2.403(O).

[11] Judgment as a matter of law was also appropriate when Auto-Owners subsequently moved for a directed verdict. At trial, plaintiff candidly admitted that he filled out the answers to the interrogatories in this case without the aid of counsel and signed the RS diary and submitted it to Auto-Owners—intending for it to remit payment for the services listed therein—without ever reviewing it. In other words, plaintiff admitted that he submitted the RS diary to Auto-Owners recklessly. He also admitted that some of the replacement services for which he had requested payment had never actually been provided, and that he had requested wage-loss benefits for a four-month period during which he had been able to work.