# STATE OF MICHIGAN

# COURT OF APPEALS

TAMMY McNEIL-MARKS,

Plaintiff-Appellant,

v

MIDMICHIGAN MEDICAL CENTER-
GRATIOT,

Defendant-Appellee.

FOR PUBLICATION
June 16, 2016
9:00 a.m.

No. 326606
Gratiot Circuit Court
LC No. 14-011876-NZ

Before: SAWYER, P.J., and HOEKSTRA and WILDER, JJ.

WILDER, J.

In this employment matter, plaintiff, Tammy McNeil-Marks, appeals as of right the trial court's order granting summary disposition to defendant, Midmichigan Medical Center-Gratiot (MMCG). We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

This case arises out of plaintiff's discharge from her position at MMCG. In 1991, plaintiff was hired as a registered nurse at a different Midmichigan Medical Center, which is located in Midland. She subsequently transferred to the Gratiot location (MMCG), where she began to serve as clinical manager of perioperative services and ambulatory care.

Between 2006 and 2008, plaintiff adopted two children and had a third placed in her custody (collectively the children). Each child has a different father, but the biological mother of all three is Sandi Lee Freeze, who is plaintiff's second cousin. Freeze's mother—the children's grandmother—is Marcia Fields. According to plaintiff, Fields suffers from several psychiatric disorders, including "paranoid schizophrenia, multiple personality disorder," and "bipolar depression." During the adoption process, Fields began to threaten plaintiff. She threatened to kill plaintiff, the children, and plaintiff's biological children. Such threats led plaintiff to seek a personal protection order (PPO) against Fields, which was eventually granted on an ex parte basis.

It is unclear from the record precisely when the initial PPO was issued, but presumably because it had expired, on December 19, 2012, plaintiff, through her legal counsel, Richard Gay, filed a petition again seeking an ex parte PPO against Fields. That same day, a circuit court

-1-

judge granted plaintiff's ex parte petition, entering a PPO that prohibited Fields from having any contact with the children and from "posting a message through the use of any medium of communication, including the internet or a computer or any electronic medium, pursuant to MCL 750.411a."

After its entry, Fields allegedly violated the PPO on several occasions by sending electronic messages to plaintiff. When plaintiff contacted local police regarding Fields's purported violations of the PPO, and attempted to file a police report, the police "told [her] that [she] needed to contact [her] attorney, not them [the police]," because the PPO had never been properly entered in the Law Enforcement Information Network (LEIN). On January 14, 2013, the circuit court entered an amended PPO, this time ordering Fields, among other things, to refrain from "stalking" plaintiff, as that term is "defined under MCL 750.411h and MCL 750.411i, which includes but is not limited to" (1) "following or appearing within sight of" plaintiff, (2) appearing at plaintiff's workplace or residence, and (3) "approaching or confronting [plaintiff] in a public place or on private property." The amended PPO explicitly noted that it would "remain[] in effect until 12/31/2013." Ignoring the amended PPO, Fields continued to contact plaintiff.

On December 27, 2013—four days before the expiration date of the amended PPO— plaintiff filed a motion, through Gay, to extend the amended PPO for another year [Motion, part of Exhibit 2 to MSD; part of Exhibit 3 to MMCG's Brief on Appeal]. Later that day, the circuit court granted plaintiff's motion on an ex parte basis. It entered a new PPO, which again ordered Fields to refrain from "stalking" plaintiff, as that term is "defined under MCL 750.411h and MCL 750.411i," and which specified, "This order is effective when signed, enforceable immediately, and remains in effect until 12/31/2014.

While at work roughly two weeks later, on January 13, 2014, plaintiff encountered Fields in a hallway at MMCG. At her deposition, plaintiff described the encounter as follows:

> *Q*. Okay. You were walking down the hallway?
>
> *A*. I came out of the operating room door. . . . I said "Hello" because you're trained to always speak to people. I didn't even realize who she [Fields] was or who the transporter was that was transporting her. I got three steps down the hallway and [Fields] said, "Hello, Tammy," in one of those little voices she does, and my stomach sank.
>
> *Q*. She was being transported, in the sense that she was not walking herself?
>
> *A*. Correct. She was in a wheelchair.
>
> \* \* \*
>
> *Q*. Do you know what area of the hospital she had been admitted into?
>
> *A*. No, I do not. Nor did I at that time.

*Q.* Did you understand that she was inpatient?

*A.* No, I did not.

*Q.* You didn't know, or you understood something different than that?

*A.* No, I had no way of knowing where [Fields] had came from [sic] in the hospital. Those transporters transport from the ER, the tower, all outpatient services, she could have came from [sic] anywhere and be going anywhere.

\* \* \*

*Q.* After you had passed, [Fields] said, "Hello, Tammy"?

*A.* Yes.

*Q.* In whatever voice you had described?

*A.* A little sing-songy voice she has when she feels she has passed something over on you like a little kid. It's very specific.[1]

*Q.* Were any other words exchanged?

*A.* No. I immediately went into another door.

*Q.* Do you have any reason to think that she somehow planned that encounter with you, meaning that she knew that you were going to be coming down the hallway in the moment that she was getting wheeled to a procedure?

[Plaintiff's counsel places an objection to foundation on the record, then instructs plaintiff to answer.]

*A.* I believe on more than one occasion she has admitted herself in the hospital with the hopes that she could . . . make contact with me, yes.

*Q.* Well, I'm talking about with regard to this particular encounter, and then if you want we can expand on that; okay?

*A.* Okay.

*Q.* So with this particular encounter, the two of you had passed each other in the hallway.

---

[1] Plaintiff later described Fields's vocal tone metaphorically as the tone of "the cat that just ate the canary"—a tone which indicated that Fields knew "she[ had] gotten away with something she's not supposed to do."

*A.* I don't believe that . . . that anybody could necessarily—that wouldn't be a reasonable expectation, that she could plan to pass me in the hallway.

*Q.* After that encounter in the hallway, did you see her again at [MMCG]?

*A.* No, I did not.

After encountering Fields, plaintiff immediately went into an employee break room. She was "visibly upset and shaking," so much so that a co-worker voiced concern, asking plaintiff what was wrong. Plaintiff was particularly upset that, through their encounter, Fields had learned "specifically where in the hospital" plaintiff worked. She feared that such knowledge would make Fields a danger to not only plaintiff but also her fellow employees. A short time later, plaintiff called her supervisor, Theresa Baily, who was already aware that plaintiff held a PPO against Fields, and informed Baily about what had transpired.

After speaking with Baily, plaintiff called her attorney, Gay, and told him, "she [Fields] showed up today at my workplace." According to plaintiff, Gay never asked for further explanation about what plaintiff "meant" when she said that Fields "showed up" at MMCG. At no time did plaintiff inform Gay that Fields "was there in any form as a patient," or that Fields had been in a wheelchair. Likewise, plaintiff said nothing to Gay about the possibility of serving Fields, while she was at MMCG, with the latest PPO. Rather, questioning whether it was advisable to serve the PPO, plaintiff instructed Gay "not to serve [Fields] at all[.]" Gay confirmed that, through his conversation with plaintiff he "was aware that [] Fields had approached [plaintiff] at the hospital in violation of the PPO," but he did "not have any information from her [plaintiff] that she [Fields] was a patient at the hospital[.]"

It is undisputed, however, that later that evening, while still a patient at MMCG, Fields was served with the PPO in her hospital room. According to plaintiff and Gay, Fields's service occurred as a matter of happenstance, bearing no causal relationship to the encounter between plaintiff and Fields earlier that day. At the time, Gay's secretary, Deborah Brown, was dating Gay's process-server, Lynn Beetley. Brown was at MMCG visiting another patient when "she thought she saw [] Fields as a patient" there. Brown called Gay, asking whether "it would be okay to serve [Fields] at the hospital," despite the fact that Fields was a patient. Gay responded, "it sounds okay to me[.]" Brown evidently informed Beetley of the opportunity because, according to Gay, Beetley went to MMCG "during regular visiting hours, [] went to the desk," identified himself, asked for and received Fields's room number, then went to her room and served her.

Fields and her family reported the incident to MMCG as a suspected violation of federal privacy regulations, specifically those set forth by the Health Insurance Portability and Accountability Act (HIPAA).[2] Specifically, Fields alleged that, after encountering Fields at MMCG, plaintiff must have "accessed her record somehow electronically," used such access to obtain Fields's room number, and then informed Gay of Fields's patient status and room number.

---

[2] The HIPAA is codified at 29 USC 1181 *et seq.*; 42 USC 300gg; and 42 USC 1320d *et seq.*

An electronic audit later revealed that plaintiff did not improperly access Fields's electronic records.

On January 16, 2014, which was three days after plaintiff encountered Fields at MMCG, Gay filed, on plaintiff's behalf, a motion seeking to have Fields held in contempt for alleged violations of the PPO—not including her encounter with plaintiff at MMCG. A motion hearing was scheduled, but it was subsequently adjourned at Fields's reques.

In reaction to Fields's HIPAA complaint, MMCG began an investigation, which involved several staff members, including MMCG's privacy officer, Suzanne Broudbeck. During the investigation, plaintiff admitted that she told Gay that Fields was "at the hospital" on January 13, 2014, but she denied ever revealing Fields's patient status to Gay. According to plaintiff, when she explained to Broudbeck how Fields had been located and served—without plaintiff divulging Fields's patient status—Broudbeck called plaintiff "a liar." Moreover, in the course of the investigation, after learning of the upcoming hearing on plaintiff's motion to hold Fields in contempt for violating the PPO, Broudbeck "threatened" that plaintiff would be terminated if she testified at the hearing, as planned, regarding her interaction with Fields at MMCG:

> I was told by [] Broudbeck that if I even mentioned [] seeing [Fields] in the hallway . . . that would be grounds for being fired. And at that point I was still [] employed at [MMCG].

> \* \* \*

> I said, "If the judge asks me outright if I saw [Fields], am [I] allowed to answer truthfully?" And [Broudbeck] said no, that I am not allowed to answer that, or it would be grounds for termination.

> \* \* \*

> And she said . . . if you answer those questions you will be fired.

At her deposition, Broudbeck categorically denied making such statements or ever discussing the circuit court proceedings with plaintiff.

Following her investigation, Broudbeck concluded that plaintiff had violated both the HIPAA and MMCG's privacy policies by disclosing Fields's "protected health information" (PHI) to Gay, specifically by "disclos[ing] that the patient [Fields] was here at the hospital." As a result, plaintiff was terminated on February 14, 2014. The "Corrective Action and Disciplinary Form" that she was given at the time of termination cited plaintiff's telephone conversation with Gay as a "severe breach of confidentiality and violation[] of HIPAA privacy/practices," which was the reason for her discharge.

Several months later, a motion hearing took place regarding plaintiff's motion to hold Fields in contempt for violating the PPO. Fields pleaded guilty to violating the PPO. According to plaintiff, at the hearing, Fields admitted that she "violated the PPO by being present" at MMCG.

## II. PROCEDURAL BACKGROUND

Plaintiff instituted this action by filing a two-count complaint against MMCG. She alleged that her termination violated both the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, and Michigan public policy, because MMCG terminated her for either reporting Fields's violation of the PPO to Gay, or being about to report that violation to the circuit court. [Complaint, March 10, 2014, LCF.]

Following discovery, MMCG moved for summary disposition under MCR 2.116(C)(10). In support, MMCG argued that plaintiff had failed to establish a prima facie case of unlawful retaliation under the WPA because (1) she never reported Fields's alleged violation of the PPO to a "public body" as defined under the WPA, and (2) plaintiff could not have reasonably suspected that Fields's conduct—encountering plaintiff by accident while being transported in a wheelchair—violated the "stalking" prohibition in the PPO. MMCG further argued that, even if plaintiff could state a prima facie case under the WPA, she had failed to introduce any evidence that MMCG's stated reason for terminating her—i.e., its conclusion that she had violated HIPAA privacy regulations—was pretextual. With regard to plaintiff's public policy claim, MMCG argued that the WPA preempts any such claim. In any event, MMCG argued, plaintiff had presented no evidence that her termination was based on her refusal to violate the law, or conceal a crime, in contravention of this state's established public policy.

In response, plaintiff argued that (1) under the WPA, Gay qualifies as a member of a "public body" because he is, as an attorney, an officer of the court and therefore a "member or employee of the judiciary," (2) likewise, he qualifies as a member of a "body which is created by state . . . authority," specifically the Michigan Bar Association, (3) as such, plaintiff's telephone conversation with Gay constituted a report to a member of a "public body" of a violation, or suspected violation, of law, (4) plaintiff's activity was also protected under the WPA because, at the time she was terminated, she was "about to report" Fields's conduct to the circuit court, was threatened with termination if she did so, and was subsequently terminated under circumstances from which a reasonable inference of retaliation could be drawn, and (5) the stated reason for plaintiff's termination was pretextual because there is no evidence that plaintiff violated HIPAA by revealing Fields's patient status. Regarding her public policy claim, plaintiff argued that (1) the claim was not preempted by the WPA, (2) she had presented sufficient evidence to create a genuine issue of material fact about whether she was, contrary to Michigan public policy, discharged for refusing to conceal a criminal act, and (3) as with the WPA claim, the stated reason for plaintiff's termination was pretextual.

The trial court ultimately granted MMCG's motion for summary disposition of both claims. The trial court reasoned that plaintiff's telephone conversation with Gay was not "a communication to a public body," further reasoning that, "[a]bsent such a communication, there is no [WPA] claim[.]" The trial court also concluded that, as a matter of law, Fields's conduct at MMCG did not violate the PPO, and that it was unreasonable for plaintiff to suspect that such conduct violated the PPO. Finally, concerning the public policy claim, the trial judge held, "there was, in my judgment, no request by the hospital . . . to conceal or hide the existence of a, quote, crime, close quote, even if that, quote, crime, close quote, was simply the misdemeanor violation of a [PPO]."

## III. ANALYSIS

### A. STANDARD OF REVIEW

We review de novo "[a] trial court's decision on a motion for summary disposition." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366; 817 NW2d 504 (2012). "A motion for summary disposition under MCR 2.116(C)(10) challenges the factual sufficiency of the complaint, with the trial court considering the entire record in a light most favorable to the nonmoving party." *LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 34; 852 NW2d 78 (2014). "The moving party has the initial burden of supporting its position with documentary evidence, but once the moving party meets its burden, the burden shifts to the nonmoving party to establish that a genuine issue of disputed fact exists." *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 310; 660 NW2d 351 (2003). Judgment as a matter of law is appropriate where the evidence demonstrates that no genuine issue of material fact remains. *Karbel v Comerica Bank*, 247 Mich App 90, 97; 635 NW2d 69 (2001) (citation omitted). Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient. *Id.* at 97-98 (citation omitted). We also review de novo, as legal questions, the proper interpretation of the WPA, *Wurtz v Beecher Metro Dist*, 495 Mich 242, 249; 848 NW2d 121 (2014), and issues regarding preemption, *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014).

### B. WHISTLEBLOWER CLAIM

Section 2 of the WPA provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [MCL 15.362.]

To establish a prima facie case under the above provision, "a plaintiff must show that (1) the plaintiff was engaged in a protected activity as defined by the WPA, (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge." *Manzo v Petrella*, 261 Mich App 705, 712; 683 NW2d 699 (2004). " 'Protected activity' under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). An employee asserting the second type of claim—an "about to report" claim—must support that claim with "clear and convincing evidence that he or she or a person acting on his or her behalf was about to report, verbally or in writing, a violation or a suspected violation . . . to a public body." MCL 15.363; see also *Chandler*, 456 Mich at

400.  "The first two types of activity are protected, 'unless the employee knows that the report is false.' "  *Truel v City of Dearborn*, 291 Mich App 125, 138; 804 NW2d 744 (2010), quoting MCL 15.362.  "In other words, reporting or being about to report violations or suspected violations is protected if the report is or is about to be made *in good faith*."  *Id.* (emphasis added).  The "violation" or "suspected violation" at issue need not be one committed by the employer or one of the plaintiff's co-workers; rather, the scope of the WPA is "broad enough to cover violations of the law by a third person."  *Chandler*, 456 Mich at 404; see also *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 575; 753 NW2d 265 (2008) ("There is absolutely nothing, express or implied, in the plain wording of the statute that limits its applicability to violations of law *by the employer* or to investigations *involving the employer*.").

To establish a prima facie case, a plaintiff can rely on either direct evidence of retaliation or indirect evidence.  See *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013), citing *Hazle v Ford Motor Co*, 464 Mich 456, 464; 628 NW2d 515 (2001).  " 'Direct evidence' is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Powers v Post-Newsweek Stations*, 483 Mich 986, 987 n 3; 764 NW2d 564 (2009), citing *Hazle*, 464 Mich at 462.  If the plaintiff establishes a prima facie case, a presumption of retaliation arises, which the employer can rebut by offering "a legitimate reason for its action[.]"  *Debano-Griffin*, 493 Mich at 176.  To avoid summary disposition after the employer offers such a reason, the plaintiff must "show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action," i.e., that the employer's articulated "legitimate reason" was a pretext disguising unlawful animus.  *Id.*, quoting *Hazle*, 464 Mich at 465.

> A plaintiff can establish that a defendant's articulated legitimate . . . reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1998).]

The germane inquiry is whether the employer was motivated by retaliatory animus, "not whether the employer is wise, shrewd, prudent, or competent."  *Hazle*, 464 Mich at 476 (quotation marks and citation omitted).

In dismissing plaintiff's WPA claim, the trial court concluded, *inter alia*, that it was immaterial whether plaintiff made a report regarding Fields's conduct to a "public body" before she was terminated, or was about to make such a report, because Fields's conduct did not violate an existing PPO.  The trial court further found that plaintiff could not have reasonably believed that Fields's conduct violated an existing PPO.

By so ruling, the trial court erred.  Among other things, the December 27, 2013 PPO ordered Fields to refrain from "stalking" plaintiff, as that term is "defined under MCL 750.411h and MCL 750.411i," and specified that it was both "effective when signed" and "enforceable immediately[.]"

MCL 600.2950(1)(i) prohibits stalking, which MCL 750.411h(1)(d) defines as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested."

"Harassment" is defined in MCL 750.411h(1)(c) as

conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

"Unconsented contact" is defined as

*any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued.* Unconsented contact includes, *but is not limited to*, any of the following:

(*i*) Following or appearing within the sight of that individual.

(*ii*) Approaching or confronting that individual in a public place or on private property.

(*iii*) Appearing at that individual's workplace or residence.

(*iv*) Entering onto or remaining on property owned, leased, or occupied by that individual.

(*v*) Contacting that individual by telephone.

(*vi*) Sending mail or electronic communications to that individual.

(*vii*) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual. (MCL 750.411h(1)(e).)

There must be evidence of two or more acts of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress. MCL 750.411h(1)(a). [*Hayford v Hayford*, 279 Mich App 324, 330; 760 NW2d 503 (2008) (emphasis added).]

It is true that, to constitute stalking, there must be a "*willful* course of conduct[.]" MCL 750.411h(1)(d) (emphasis added). But even if Fields's initial encounter with plaintiff in the hallway at MMCG was not willful, and was instead accidental, her subsequent verbal *communication* with plaintiff constituted willful, unconsented contact under MCL 750.411h(1)(e); it was "contact with [plaintiff] that [wa]s initiated or continued without [plaintiff's] consent or in disregard of [her] expressed desire that the contact be avoided or discontinued." Plaintiff has been granted a series of PPOs against Fields—on an ex parte basis—because Fields persists in contacting plaintiff against her wishes, and in such communications Fields has threatened the lives of both plaintiff and her children. Even if Fields could not have planned her contact with plaintiff or avoided such contact, after she saw plaintiff, Fields made a deliberate choice to speak to her, and such deliberation made the communication willful. Moreover, the record establishes that Fields did so in a decidedly willful tone—a tone indicating that she knew "she[ had] gotten away with something she's not supposed to do." Thus, viewing the evidence in the light most favorable to plaintiff, Fields's conduct, in concert with her prior unconsented contacts with plaintiff, qualified as "stalking" in violation of the PPO.

Furthermore, even assuming, for the sake of argument, that Fields's conduct did not *actually* violate the PPO, plaintiff is still afforded the protection of the WPA so long as she, in good faith, reported, or was about to report, Fields's conduct to a public body as a *suspected* violation of the PPO. See *Truel*, 291 Mich App at 138 ("The first two types of activity are protected, 'unless the employee knows that the report is false.' MCL 15.362. In other words, reporting or being about to report violations or suspected violations is protected if the report is or is about to be made in good faith."). There is no evidence that plaintiff acted in bad faith, i.e. that she did not actually believe that Fields's conduct violated the PPO. Hence, if plaintiff reported such conduct to a public body, or was about to do so, she was engaged in protected activity under the WPA.

Thus, the crucial inquiry is whether plaintiff reported Fields's conduct to a public body before she was terminated or was about to do so at the time of termination. The trial court decided that she did not, reasoning that plaintiff's telephone conversation with Gay was not "a communication to a public body[.]" Plaintiff argues that the trial court's decision was erroneous because, as a licensed Michigan attorney, Gay qualifies as a member of a "public body" for WPA purposes. We agree.

In *Hoffenblum v Hoffenblum*, 308 Mich App 102, 109-110; 863 NW2d 352 (2014), this Court reiterated certain principles of statutory construction that are germane to our instant analysis:

> The primary goal when interpreting a statute is to ascertain and give effect to the Legislature's intent. The words contained in a statute provide us with the most reliable evidence of the Legislature's intent. Statutory provisions are not to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole. If statutory language is unambiguous, the Legislature is presumed to have intended the plain meaning of the statute. An unambiguous statute must be enforced as written. [Quotation marks, citations, and brackets omitted.]

"If a statute specifically defines a term, the statutory definition is controlling." *City of Holland v Consumers Energy Co*, 308 Mich App 675, 684; 866 NW2d 871 (2015).

The phrase "public body" is statutorily defined by the WPA as "all of the following:"

> (*i*) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.
>
> (*ii*) An agency, board, commission, council, member, or employee of the legislative branch of state government.
>
> (*iii*) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.
>
> (*iv*) *Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.*
>
> (*v*) A law enforcement agency or any member or employee of a law enforcement agency.
>
> (*vi*) The judiciary and any member or employee of the judiciary. [MCL 15.361(d) (emphasis added).]

It is undisputed that Gay was a licensed Michigan attorney, and a member in good standing of the Michigan Bar Association (MBA), when plaintiff called him and reported her contact with Fields. Indeed, as a practicing attorney, Gay's licensure and active membership in the MBA were both mandatory. See MCL 600.916(1); see also *Morris & Doherty, PC v Lockwood*, 259 Mich App 38, 49; 672 NW2d 884 (2003) ("A person engaged in the practice of law in Michigan must be an active member of the State Bar."), quoting State Bar Rule 3. Moreover, under MCL 600.901,

> The state bar of Michigan is a public body corporate, the membership of which consists of all persons who are now and hereafter licensed to practice law in this state. The members of the state bar of Michigan are officers of the courts of this state, and have the exclusive right to designate themselves as "attorneys and counselors," or "attorneys at law," or "lawyers." No person is authorized to practice law in this state unless he complies with the requirements of the supreme court with regard thereto.

And under MCL 600.904, our Supreme Court is empowered "to provide for the organization, government, and membership of the [MBA], and to adopt rules and regulations concerning the conduct and activities of the [MBA] and its members," including "the schedule of membership dues therein[.]"

Hence, under the plain language of the WPA, specifically MCL 15.361(d)(*iv*), Gay qualified as a member of a "public body" for WPA purposes. As a practicing attorney and member of the MBA, Gay was a member of a body "created by" state authority, which, through the regulation of our Supreme Court, is also "primarily funded by or through" state authority.[3] By holding otherwise, the trial court erred. It further erred by concluding that a report to a public body is a necessary prerequisite to establish a prima facie case under the WPA. A report to a public body is only one of the three types of "protected activity" under the WPA. *Chandler*, 456 Mich at 399.

Having reviewed the record evidence in the light most favorable to plaintiff, we conclude that she presented sufficient evidence to establish a prima facie case under the WPA. As we have already discussed, her report to Gay was a report to a member of a public body, and therefore it was protected activity under the WPA, which satisfies the first element for a prima facie case. Moreover, the second element is satisfied by the fact that plaintiff was discharged. Finally, plaintiff has presented direct evidence supporting the third element—i.e., a causal connection between the discharge and the report to Gay—specifically the "Corrective Action and Disciplinary Form," which explicitly cites plaintiff's telephone conversation with Gay as a factor motivating MMCG's discharge decision. Given such direct evidence of unlawful retaliation, plaintiff is not required to proceed under the *McDonnell Douglas*[4] framework. See *DeBrow v Century 21 Great Lakes, Inc (After Remand),* 463 Mich 534, 539-540; 620 NW2d 836 (2001) ("Where direct evidence is offered to prove discrimination, a plaintiff is not required to establish a prima facie case within the *McDonnell Douglas* framework, and the case should proceed as an ordinary civil matter.") (quotation marks, citation, and footnote omitted). Likewise, the direct evidence presented by plaintiff is sufficient to survive summary disposition despite the legitimate reason MMCG offers for its action—that it suspected plaintiff of violating the HIPAA by disclosing Fields's patient status. Given the record evidence, even if HIPAA concerns were *part* of MMCG's ultimate decision, "a reasonable fact-finder could still conclude that [] plaintiff's protected activity was a 'motivating factor' for [MMCG]'s adverse action." See *Debano-Griffin*, 493 Mich at 176, quoting *Hazle*, 464 Mich at 465.

Therefore, regarding plaintiff's WPA claim, the trial court erred by granting summary disposition to MMCG under MCR 2.116(C)(10). A genuine issue of material fact remains about whether plaintiff's report of Fields's conduct to Gay was a motivating factor in MMCG's decision to terminate plaintiff.

---

[3] Having concluded that Gay was a member of a public body as defined under MCL 15.361(d)(*iv*), we need not consider plaintiff's alternative argument that, as a licensed attorney and officer of the court, Gay also qualified as a "member or employee of the judiciary" under MCL 15.361(d)(*vi*).

[4] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

## C.  PUBLIC POLICY CLAIM

"[T]he remedies provided by the WPA are exclusive and not cumulative." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 532; 854 NW2d 152 (2014).  Thus, when a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA, "[t]he WPA provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity." *Anzaldua v Neogen Corp*, 292 Mich App 626, 631; 808 NW2d 804 (2011).

Plaintiff alleges that she was discharged for reporting a violation of the law, or being about to report such a violation, to a public body or a member of such a body.  Both activities constitute protected activity under the WPA.  *Chandler*, 456 Mich at 399.  And contrary to plaintiff's argument on appeal, her public policy claim arises out of the "same activity" as the WPA claim for preemption purposes.  Plaintiff argues that, aside from discharging her for reporting Fields's conduct to Gay, and for being about to report that conduct to the trial court, MMCG also discharged her for refusing to conceal Fields's violation of the PPO.  Plaintiff further argues that her refusal to *conceal* the violation is different than the affirmative act of reporting it or being about to report it.  But plaintiff's refusal to conceal the violation was effectuated by her report to Gay, and there is no record evidence that plaintiff was instructed to conceal such activity before her telephone conversation with Gay.

Under the circumstances, we see no logical distinction between the refusal to conceal and the report by which that refusal manifested itself; rather, the two are flip sides of the same coin.  Because plaintiff's public policy claim arises out of the same activity as her WPA claim, the trial court properly concluded that the former claim preempts the latter.  Thus, summary disposition of the public policy claim was appropriately granted.

## IV.  CONCLUSION

We affirm the trial court's ruling regarding plaintiff's public policy claim, reverse its summary dismissal of the WPA claim, and remand this matter to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.  Each having prevailed in part, the parties may not tax costs under MCR 7.219.

/s/ Kurtis T. Wilder
/s/ David H. Sawyer
/s/ Joel P. Hoekstra