*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF BRADY LANE MORTON, by
ROBIN A. MORTON, Successor Personal
Representative,

       Plaintiff-Appellant,

v

THETA CHI FRATERNITY, ZETA TAU
CHAPTER OF THE THETA CHI FRATERNITY,
NICK LOONEY, and NICK NIVISON,

       Defendants-Appellees.

UNPUBLISHED
November 19, 2019

No. 344556
St. Clair Circuit Court
LC No. 16-002055-NO

Before: JANSEN, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Plaintiff, the estate of Brady Lane Morton (Morton), through its successor personal representative Robin A. Morton, appeals by right the trial court's order granting summary disposition in favor of defendants Theta Chi Fraternity (Theta Chi), Zeta Tau Chapter of the Theta Chi Fraternity (Zeta Tau)[1], Nick Looney (Looney) and Nick Nivison (Nivison). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of Morton's drowning death during the 2014 "St. Clair River Float Down" (the float-down). The float-down began in the 1980s as an annual public event, but it was outlawed by the United States Coast Guard for approximately 20 years before unofficially

---

[1] We will refer in this opinion to the national organization as Theta Chi and the local chapter as Zeta Tau.

resuming.  As described in a temporary rule that the United States Coast Guard promulgated in 2019:

> The event is advertised over various social-media sites, in which a large number of persons float down a segment of the St. Clair River, using inner tubes and other similar floatation devices. . . .  This non-sanctioned event has taken place in the month of August annually since 2009.
>
> No private or municipal entity requested a marine event permit from the Coast Guard for this event, and it has not received state or federal permits since its inception.  The event has drawn over 5,000 participants of various ages annually.  Despite plans put together by federal, state and local officials, emergency responders and law enforcement officials have been overburdened pursuing safety during this event.  Medical emergencies, people drifting across the international border, and people trespassing on residential property . . . are some of the numerous difficulties encountered during the float down event.  [Coast Guard, *Safety Zone; Port Huron Float Down, St. Clair River, Port Huron, MI*, 84 Fed Reg 34304, § II (July 18, 2019).]

According to Lieutenant Paul Reid, the head of the marine unit of the St. Clair County Sheriff's Department, the St. Clair River is a "deep" "shipping lane," with a "fast-moving current," that "can be very dangerous."  Lieutenant Reid testified at his deposition that, on average, two or three people drown in the river each year because they are "not accustomed to the current."  When asked about the float-down specifically, Lieutenant Reid stated that to ensure the safety of the unsanctioned event's participants, the authorities are forced to "close the river down to shipping traffic and all boat traffic except for patrol boats" for approximately eight hours on the day of the event.  Lieutenant Reid further stated that although there is signage at Port Huron's Lighthouse Beach Park (where most participants enter the water) warning of the "dangerous current" and "undertow," and stating that swimmers enter the water at their own risk, about 4,000 to 5,000 people nevertheless participate in the float-down annually, with many openly consuming alcohol on the beach beforehand.  He described it as a dangerous event and observed that "[a]ll these events involve lots of people and lots of drinking."  Because of a lack of manpower, Lieutenant Reid explained, the general policy of law enforcement at the float-down is to refrain from enforcing drinking laws and instead focus on assisting participants who end up in distress and helping to tow wayward participants back into American waters.  Lieutenant Reid noted that, despite the associated dangers, participants routinely leave their makeshift rafts or flotation devices while in the middle of the river and attempt to swim to shore.  When the authorities locate such individuals, they "encourage people to get back on their raft, especially if they're not wearing life jackets."

During the first few months of 2014, Morton, who was then attending the University of Michigan-Flint, became a member of the national fraternity Theta Chi's local chapter, Zeta Tau.  The underage Morton regularly consumed alcohol with fraternity members, including Nivison, often to excess.  Members of the fraternity routinely frequented a bar in Flint that had an "18-and-over" night, and on such nights, members who were more than 21 years of age would purchase alcohol and give it to underage persons, including Morton and his girlfriend, Natalie Werner.  Morton was also served alcohol at events hosted by the fraternity, although he

sometimes supplied his own alcohol. Photographs of Nivison and Morton, apparently taken at a party on some date before the float-down, show them playing a drinking game with 40-ounce beers duct-taped to their hands. Nivison agreed that Morton seemingly had "a problem" with drinking and that Morton had, on at least two occasions that Nivison recalled, "passed out" from drinking too much. According to Werner, in the months leading up to Morton's death, his family had also become concerned about his alcohol use.

Zeta Tau member Jacob Rathbun testified at his deposition that he sent electronic invitations (via Facebook) to attend the 2014 float-down to more than 100 people, including many—but probably not all—of Zeta Tau's members. When choosing invitees, he selected "the people [he] was closest to that would normally come out to an event like that," along with anyone who had expressed interest in attending the float-down. Some of the invitees were "sorority girls," and no one was "intentionally excluded." Ultimately, several people whom Rathbun did not know attended the float-down and joined the group of people whom Rathbun had invited.

Eric Anderson, who was a member of Zeta Tau during the pertinent timeframe, at times serving as its treasurer, assistant treasurer, and social chair, testified that he and Morton were friends and that Morton stayed at Anderson's house the night before the 2014 float-down. That evening, Morton showed Anderson a "fake ID" that he had with him. Morton also brought over a "decoy flask," which was disguised as a bottle of suntan lotion and filled with cinnamon whiskey, and a 30-pack of ice beer, from which he drank "probably seven or eight beers the night before" the float-down. The next morning, Morton drove Anderson and several others to the float-down. On the way, they rendezvoused with Nivison and his girlfriend at Nivison's mother's house.

According to Anderson and Nivison, after arriving at Lighthouse Beach the group eventually merged with a sizable "group of friends," which was made up of several members of Zeta Tau, "an awful lot of non-fraternity brothers," "a lot of sorority girls," and the significant others of various members of the group. Everyone in the group "pretty much had their alcohol," and they began to drink at the beach while they tied together their various flotation devices into a makeshift raft of sorts. Anderson and Morton initially started the float-down together in an inflatable boat, along with Anderson's girlfriend, Nivison, Nivison's girlfriend, and Brandon Mattilla, but Morton "love[d] the water because he grew up on a lake, was on a ski team," and "was a very, very strong swimmer," so shortly after the group left shore, Morton "was quickly jumping from raft to raft and swimming to shore and all that. So he really wasn't on that raft for like the duration." Anderson stated that he never left the boat, but that others aside from Morton also left the raft at times to swim.

Rathbun testified that shortly before 5:00 p.m., someone noticed that Morton was missing. Search efforts were commenced, and several days later, Morton's lifeless body was found in the river. Following an autopsy, which revealed a blood alcohol concentration (BAC) of 0.288 (i.e., 0.288 grams of ethanol per 100 milliliters of blood), the medical examiner determined the cause of death to be accidental drowning and acute alcohol intoxication.

Plaintiff filed suit against defendants for wrongful death, alleging that defendants' negligence had caused Morton's death. Following discovery, defendants moved for summary

disposition, which the trial court granted under MCR 2.116(C)(10). The trial court reasoned in part that the float-down was a public event, not a fraternity event, that defendants owed no duty to Morton, and that plaintiff had failed to establish a genuine issue of material fact regarding whether any alcohol had been "furnished" to Morton.

This appeal followed.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision regarding a motion for summary disposition. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009). "[W]here, as here, the trial court considered material outside the pleadings, this Court will construe the motion as having been granted pursuant to MCR 2.116(C)(10)." *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

## III. ANALYSIS

As an alternative ground for affirmance, defendants argue that regardless of the trial court's stated reasons for granting their motion for summary disposition, they were entitled to summary disposition as a matter of law under MCL 600.2955a.[2] We agree and affirm on that basis. See *Middlebrooks v Wayne Co*, 446 Mich 151, 166 n 41; 521 NW2d 774 (1994) (recognizing that an appellee may argue alternate grounds for affirmance without the necessity of a cross-appeal).

---

[2] Defendants raised this issue in the trial court as well, but the trial court declined to address it, having granted summary disposition to defendants on alternate grounds.

MCL 600.2955a provides in pertinent part:

> (1) It is an absolute defense in an action for the death of an individual or for injury to a person or property that the individual upon whose death or injury the action is based had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury.

> (2) As used in this section:

> \* \* \*

> (b) "Impaired ability to function due to the influence of intoxicating liquor or a controlled substance" means that, as a result of an individual drinking, ingesting, smoking, or otherwise consuming intoxicating liquor or a controlled substance, the individual's senses are impaired to the point that the ability to react is diminished from what it would be had the individual not consumed liquor or a controlled substance. An individual is presumed under this section to have an impaired ability to function due to the influence of intoxicating liquor or a controlled substance if, under a standard prescribed by section 625a of the Michigan vehicle code . . . a presumption would arise that the individual's ability to operate a vehicle was impaired.

"[T]he absolute defense of impairment provided by MCL 600.2955a serves a unique legislative purpose." *Harbour v Correctional Med Servs, Inc*, 266 Mich App 452, 460; 702 NW2d 671 (2005). "[T]hose who voluntarily become intoxicated have historically been considered to have put themselves, and others, at risk of injury." *Wysocki v Kivi*, 248 Mich App 346, 368; 639 NW2d 572 (2001). By enacting MCL 600.2955a, the Legislature "sought to place more responsibility on intoxicated plaintiffs who are equally or more to blame for their injuries . . . . This legislative intent is clear from the language of the statute itself, which bars recovery for some intoxicated plaintiffs and reduces recovery for other intoxicated plaintiffs." *Id*. at 358-359. To successfully assert "the absolute defense of impairment" under MCL 600.2955a, a defendant must "establish that (1) the decedent had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and (2) that as a result of that impaired ability, the decedent was fifty percent or more the cause of the accident or event that resulted in his death." *Harbour*, 266 Mich App at 456. For these purposes, the term "event" is broadly construed as " 'something that happens or is regarded as happening; an occurrence, especially one of some importance' or 'the outcome, issue, or result of anything.' " *Id*. at 458, quoting *Piccalo v Nix (On Remand)*, 252 Mich App 675, 680; 653 NW2d 447 (2002), quoting *The Random House Dictionary of the English Language: Unabridged Second Edition* (1998).

Viewed in the light most favorable to plaintiff, reasonable minds could not differ that Morton had an impaired ability to function due to the influence of intoxicating liquor—indeed, the point is undisputed given plaintiff's theory that Morton drowned only *because* he was so intoxicated. Under MCL 600.2955a(2)(b), a decedent whose BAC exceeds the "legal

intoxication" limit set forth by MCL 257.625a is presumed to have had an impaired ability to function. *Harbour*, 266 Mich App at 457 (holding that, although the decedent in *Harbour* had been "a chronic alcoholic with a very high alcohol tolerance," because there was "no dispute that the decedent's blood alcohol level was 0.32 grams, or three times the legal limit [of 0.10]," "the decedent presumptively had an 'impaired ability to function due to the influence of intoxicating liquor' under MCL 600.2955a(2)(b).").

At the time of Morton's drowning death, a BAC of 0.08 was the legal intoxication limit for those at least 21 years old, and a BAC of 0.02 was the legal intoxication limit for those under 21 years of age. MCL 257.625a(7), as amended by 2013 PA 23 (effective date May 9, 2013). It is undisputed that the underage Morton's BAC was 0.288 at the time of his death. Therefore, he was more than 14 times the legal intoxication limit for a person of his age and was presumptively impaired for purposes of MCL 600.2955a(2)(b). See *Harbour*, 266 Mich App at 457. And because plaintiff presented no substantively admissible evidence to rebut the presumption of impairment (and instead concedes it), it is "established beyond dispute." See *id*.

Moreover, we conclude that there is no genuine issue of material fact that as a result of Morton's impaired ability, he was 50% or more the cause of the "accident or event" that resulted in his death. Although Morton was not yet of legal drinking age, he was a legal adult. In *Piccalo (On Remand)*, 252 Mich App at 680, this Court affirmed a jury's no-cause verdict under MCL 600.2955a against an intoxicated 18-year-old passenger who had been injured in a single-vehicle accident, reasoning:

> [T]here was evidence from which the jury could conclude that plaintiff was fifty percent, or more, the cause of the "event" that resulted in the injury. Plaintiff, who was over eighteen years of age but under the legal drinking age of twenty-one, elected to consume alcohol and become intoxicated. Plaintiff freely chose to accept a ride home from an intoxicated driver. Plaintiff also chose to ride in an automobile that did not have proper seating or restraints in the rear compartment and was filled with unrestrained materials including a tire and several tools. Under these circumstances, defendant was entitled to the absolute defense of impairment, and the judgment of no cause of action must be affirmed.

Similarly, the 19-year-old Morton in this case freely chose to bring a large quantity of alcohol to the unsanctioned float-down event, to venture out into the treacherous currents of the St. Clair River on a raft constructed of lashed-together inner-tubes, to consume a sufficient quantity of alcohol to achieve a BAC of 0.288, and to repeatedly leave his makeshift raft to swim in the river. It is also undisputed that Morton was a strong swimmer. Plaintiff's theory of the case, in fact, is that Morton only drowned as a result of his impairment. Under these circumstances, in which the parties essentially agree that Morton's voluntary consumption of alcohol was the cause of his death, we conclude that a reasonable jury could not differ about whether plaintiff's recovery was barred by MCL 600.2955a and therefore that defendants are entitled to judgment as a matter of law. See *Piccalo* (*On Remand*), 252 Mich App at 680; see also *Lamphiere v Abraham*, 493 Mich 1021; 829 NW2d 879 (2013), (YOUNG, C.J. (concurring)) (concurring in the denial of leave to appeal when this Court "correctly affirmed the circuit court's [grant of summary disposition] under MCL 600.2955a(1) that plaintiff's inebriation 'was 50% or more the

cause of' " the plaintiff's fall from a balcony, although the case proceeded regarding a possible separate and distinct injury caused by a delay in seeking medical treatment).

We conclude that Morton's death, while tragic, wholly or predominantly resulted from his own conduct, and that Morton alone bears personal responsibility for that. "[A]s in any aspect of life, in which choices result in consequences, [Morton's] choice resulted in a consequence for [him]. Sadly, that consequence was [his] death." See *Braverman v Granger*, 303 Mich App 587, 611; 844 NW2d 485 (2014), lv den 496 Mich 859; 847 NW2d 647 (2014), cert den, __ US __; 135 S Ct 715, 190 L Ed 2d 441 (2014) (Boonstra, P.J., concurring) ("[E]very person bears responsibility for the decisions and choices that he or she makes in life. People make decisions and choices in all aspects of their lives, and for untold hosts of reasons. But regardless of the reasons, decisions and choices have consequences. It is the essence of personal responsibility that the makers of decisions and choices, relative to their own lives, bear the consequences that flow from those decisions and choices. Our recognition of that fact is in no respect a criticism or indictment (or endorsement, for that matter) of any person's decision or choice (or of the reasons for which it was made). It is merely an acknowledgement of the principle of personal responsibility."). Rational minds could not disagree that as a result of his self-inflicted impairment, Morton was at least 50% responsible for causing the accident or event that led to his death.

On that basis, we conclude that the trial court could not have committed error warranting reversal by granting summary disposition in favor of defendants. See *Forest Hills Coop v Ann Arbor*, 305 Mich App 572, 615; 854 NW2d 172 (2014) ("This Court will not reverse a trial court's order of summary disposition when the right result was reached"). Consequently, plaintiff's several claims of error on appeal are moot, and we need not consider or decide them. See *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016) ("[a] matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy.") (quotation marks and citation omitted).

Affirmed.


/s/ Kathleen Jansen
/s/ Mark T. Boonstra
/s/ Anica Letica