*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LAURA GREEN,

Plaintiff-Appellant,

v

COUNTY OF GRAND TRAVERSE,

Defendant-Appellee.

UNPUBLISHED
March 19, 2020

No. 345135
Grand Traverse Circuit Court
LC No. 2017-032101-CZ

Before: M. J. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

Plaintiff, Laura Green, appeals as of right the trial court order granting defendant, County of Grand Traverse, summary disposition. We affirm in part and reverse in part, and remand for further proceedings.

## I. BASIC FACTS

In May 2014, Green was hired by Commission on Aging[1] as its deputy director. When the Commission's director retired, Green became its "acting director." In May 2015, the County hired Paula Sagala to provide "human resource and organizational design development consulting" services with regard to the Commission. Several months later, Thomas Menzel became the County's administrator.

According to Menzel, after he assumed that role, he was informed that the Commission's operations had not been "looked at" closely since the agency had been established approximately

---

[1] Pursuant to its governing rules, the Commission on Aging is an "agency" of the County's board of commissioners. The Commission on Aging has its own 13-member board of directors, but the board of commissioners "maintains the right to direct and override decisions of the [Commission's] Board." The Commission's stated purpose is "to provide services to persons age 60 years and older to help them to remain living independently at home and to enhance the quality of their lives."

41 years earlier. Knowing that Green was serving as the acting director, he asked her to provide "a basic business plan that would look at the organization to improve effectiveness and efficiency in its service delivery." The requested business plan was never provided.

As a result, Menzel formed a "quality assessment panel" (QAP) to perform "an internal audit" of the Commission. The QAP's membership included Green, Rodetta Harrand, who was the president of the Commission's board, Jennifer DeHaan, who was the deputy county administrator, and Sagala, who acted as chairperson. According to Green, the first meeting of the QAP was "antagonistic[.]" Green contended that, among other things, she "was protecting and being assertive about" the Commission's funding, rules, and regulations, while the other members of the QAP opposed "everything" she said. Green viewed the QAP as part of a "takeover" plan concerning the Commission's leadership and, ultimately, its millage funding.

In March 2016, Green sent an e-mail to DeHaan and Sagala proposing a revised job description for her position, in hopes of more "accurately and honestly" describing "what the person in this position actually does[.]" When describing her primary duties and responsibilities, Green stated that one of her primary duties and responsibilities was ensuring "the successful passage of the Commission on Aging Millage Renewal." In response, Sagala advised Green that there were "laws governing staff's involvement in a millage campaign" and warning her that her lack of knowledge could put the County at risk. DeHaan sent a similar response, expressing "significant concerns" that Greens actions might be contrary to the Michigan Campaign Finance Act, MCL 169.201 *et seq*. DeHaan warned Green that she had to stop "any and all activities . . . related to the renewal of the millage which could be perceived as utilizing County resources, time, equipment, or other means . . . ." Finally, Menzel sent a formal memorandum, advising Green that "[u]nder Michigan's Campaign Finance Act, MCL 169.257 a person 'acting for a public body shall not use or authorize the use of funds, personnel, office space, computer hardware or software, property, stationery, postage, vehicles, equipment, supplies, or other public resources' to campaign for elections, including local ballot proposals." Despite the warnings and directions that Green received in March 2016, it was later discovered that she continued to use her county e-mail account to send and receive e-mails related to campaign fundraising.

On October 27, 2016, Green received a memorandum indicating that she was "not performing at a level expected of a deputy director/director position in the county" and explaining that the position of deputy director was being eliminated and replaced by an office manager position. The memorandum explained that although Green had "performed to the highest level of [her] knowledge, skills, and abilities, [her] limitations have been observed and are noted." The memorandum included a bulleted list, setting forth the following reasons for the change in her position within the Commission:

- Most recently, in an email communication between human resources, you suggested that an individual seeking employment should be denied consideration because they identified a lifting restriction. At a deputy director level, it is expected that you are familiar with employment laws and assure that decisions made within your department are in accordance with such. Thankfully, the personnel specialist intervened and corrected the process before violating employment opportunity laws.

- On October 24, 2016 you forwarded a copy of a snow-plow agreement that had been mentioned during the QAP meeting. This agreement included requirements that there be an FBI criminal background check performed on all vendor employees involved in COA related work. Further communication indicated that you do not understand what the department is requiring, why, or how a vendor should verify their employee background checks were performed in accordance with the vendor requirements. It is your responsibility to understand the terms and conditions of the language in every contract and agreement required by the department.

- Entering an invalid agreement with a member of the COA board. The decision to enter this agreement was not thoroughly researched by yourself nor were the County's purchasing policies applied correctly. It is your responsibility to review policies and adhere to them to avoid conflict of interests and invalid agreements.

- In prior communications, you had acknowledged the need to focus on the current work priorities and that approximately 60% of your time was spent on COA board related time. The QAP supported you in advising this board that you would reduce your involvement to their monthly board meeting needs. This was a good move towards better time management. However, your initiating requests for the COA board to hold committee meetings (November executive committee) around your schedule and your involvement with attending other professional meetings is not in accordance with good time management or the needs to accomplish work.

- In a recent Ticker article, you did not demonstrate the judgement of leadership when you responded to a comment from a reader. You often speak about the high standard of confidentiality your department has and yet you chose to counter a reader comment about his family member and service.

- COA has not been compliant with clearly stated HIPPA[2] requirements . . . . You've previously acknowledged the HIPPA requirement but failed to establish the proper policies and procedures necessary to ensure department compliance.

- Implementing the HIPPA policy, once established, should be a deliberate process. Currently, there isn't a plan laid out to comply with all the components of the forthcoming policy. A plan would identify the steps and timeline for the proper roll out of the terms of the policy, i.e., educating

---

[2] HIPPA refers to the Health Insurance Portability and Accountability Act, which "is codified at 29 USC 1181 *et seq*., 42 USC 300gg, and 42 USC 1320d *et seq*." *McNeil-Marks v Midmich Med Ctr-Gratiot*, 316 Mich App 1, 11; 891 NW2d 528 (2016).

staff, testing staff's understanding, compliance form signatures, to name a few steps. You are responsible to assure full compliance with the internal components and steps and not to get ahead of a well laid out plan.

- Before the previous executive director retired, she established a multi-day budget training schedule for you to participate in. This was provided on your behalf as budget preparation and monitoring is a responsibility of administration. Utilizing a previous County treasurer who sits on your board to assist you was reasonable for your greater budget preparation understanding, but to be reliant on this person to the degree that their involvement helped create the budget is not in the best interest of the accountability you must have. When questions related to the budget are asked and you cannot respond confidently, it suggests your lack of knowledge.

In response, on November 4, 2016, Green sent an e-mail thanking DeHaan and Sagala for recognizing what she could now see clearly herself, i.e, that she had been "trying to do the work of two and a half people" and was lucky that she did not "implode."

The QAP's last meeting took place on November 18, 2016. Thereafter, on December 7, 2016, the County's board of commissioners voted to collect less, in property taxes, than permitted by the millage that had been approved by the local taxpayers. Although the decision was reversed before it was ever implemented, Green believed this to be an unlawful "misuse" of the millage funds.

Two months later, on February 8, 2017, Green appeared at the board of commissioner's regularly scheduled meeting. During the meeting's second round of public commentary, each person's comments were limited to three minutes. Green remarked that she has acted as a "loyal solider" for the Commission, but felt that she has "not been well treated or rewarded" for doing so. Having heard the county administration's stated reasons for forming the QAP, she stated, "I disagree with, I challenge, and I dispute" their validity. Green, however, also acknowledged that when she became acting director of the Commission, the department was a "nightmare" and had a "toxic atmosphere." And, at one point, while pointing at someone in the room, she stated that she is "not going to accept the accusations" against her. After an alarm sounded indicating that Green's time has expired, she again stated that she had been a "loyal soldier," who had formerly obeyed her instructions "not to talk about QAP," but now she thought "it all needs to come out" and she would plan on speaking further about the matter at a subsequent board meeting.

In correspondence dated the next day, February 9, 2017, Menzel terminated Green's employment "effective immediately," explaining that decision, in relevant part, as follows:

> On October 27 2016, we expressed concerns related to your poor performance and unprofessional behavior and removed you from a leadership role and placed you in an analyst role. Since that time, you have continued to fail to demonstrate the necessary knowledge, skills, and abilities nor shown initiative to assist in addressing the multitude of issues at the [Commission]. To continue to

-4-

have you attempt to perform beyond your demonstrated capacity is not in the best interest of the County or the [Commission].

In addition, the County encourages Professional dialogue regarding concerns, however, your demonstrated anger at the Board of Commissioners meeting on February 8, 2017 is perceived as a direct threat to staff of County Administration and consistent with County policy is considered insubordination.

On May 2, 2017, Green initiated this action by filing a three-count complaint against the County, asserting that she was unlawfully terminated under the Whistleblower's Protection Act (WPA), MCL 15.369 *et seq.* However, because she alleged that she was terminated for whistleblowing activities concerning the County's *planned* violations of law, in February 2018 the trial court granted summary disposition on the original WPA claim. The court relied on *Pace v Edel-Harrelson*, 499 Mich 1, 8; 878 NW2d 784 (2016), which holds "that future, planned, or anticipated acts amounting to a violation or a suspected violation of a law" are not "included within the scope of the WPA."

Thereafter, Green filed an amended complaint, removing the allegations about reporting *planned* violations of law and instead alleging that she had been terminated for having reported or for being about to report several "violations" or suspected violations of law. Green added allegations that the County's stated reasons for firing her were pretextual, and that public policy prohibited the County from firing her based on her report of *planned* violations of law. The County moved for summary disposition under MR 2.116(C)(7), (C)(8), and (C)(10). Following oral argument, in July 2018, the trial court determined that the WPA claims were barred by res judicata, so it granted summary disposition under MCR 2.116(C)(7). The court also dismissed the public-policy claim after determining that it was "not supported by the law."

This appeal follows.

## II.  SUMMARY DISPOSITION

### A.  STANDARD OF REVIEW

Green argues that in its July 2018 order the trial court erred by summarily dismissing her WPA claim under MCR 2.116(C)(7) and by dismissing her public-policy claim under MCR 2.116(C)(8) and (C)(10). She also argues that in its February 2018 order the trial court partially erred because there was a disputed question of fact as to whether the County had a legitimate, nondiscriminatory reason for discharging her. A trial court's ruling regarding a motion for summary disposition is reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

## B. ANALYSIS

We first address whether, in its July 2018 order, the trial court erred by determining that the WPA claim set forth in Green's amended complaint was barred by res judicata.[3] "The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action." *Adair v Michigan*, 470 Mich 105, 121; 680 NW2d 386 (2004). The doctrine operates "to preclude similar claims in a *subsequent* lawsuit." *Vandenberg v Vandenberg*, 253 Mich App 658, 663; 660 NW2d 341 (2002). The doctrine does not operate to preclude proceedings that are "part of a continuous action and not a separate lawsuit." *Id*. In *Vandenberg*, this Court declined to apply res judicata to bar the defendants from raising a statute of limitations defense following a remand order *in the same lawsuit*. *Id*. And, in *Mable Cleary Trust v Edward-Marlah Muzyl Trust*, 262 Mich App 485, 510; 686 NW2d 770 (2004), overruled in part on other grounds by *Titan Ins Co v Hyten*, 491 Mich 547, 555 n 4 (2012), this Court held that the plaintiff's "second amended complaint does not constitute a subsequent lawsuit for purposes of res judicata and, therefore, [the plaintiff's] claims are not barred." In this case, Green's first amended complaint does not constitute a subsequent lawsuit for purposes of res judicata. Because the doctrine of res judicata is not applicable, the trial court erred by summarily dismissing Green's WPA claim under MCR 2.116(C)(7).

Green next argues that the trial court erred by determining that she was unable to prove the causation element of her original WPA claim. In order to prevail on a WPA claim, the "plaintiff must show (1) he was engaged in protected activity as defined by the act, (2) the defendant discharged him, and (3) a causal connection exists between the protected activity and the discharge." *Chandler v Dowell Schlumberger, Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). In its February 2018 order granting summary disposition, the trial court determined that Green had not engaged in a protected activity, and the trial court expressly held that "without a protected activity, there is no claim under the WPA and analyzing whether there was a causal connection is not required." Because the trial court did not analyze whether there was a causal connection, and as it is undisputed that no activity protected by the WPA was alleged in the original complaint, there is no reversible error with regard to the February 2018 summary disposition order.

Finally, we conclude that the trial court did not err by dismissing the public-policy claim raised in Green's amended complaint. "[W]hen a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA, '[t]he WPA provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity.'" *McNeil-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 25; 891 NW2d 528 (2016) (second alteration in original), quoting *Anzaldua v Neogen Corp*, 292 Mich App 626, 631; 808 NW2d 804 (2011). "However, if the WPA does not apply, it provides no remedy and there is no preemption." *Anzaldua*, 292 Mich App at 631. Green contends that, if the WPA

---

[3] The County also asserted that the WPA claim in Green first amended complaint was barred by collateral estoppel. "Collateral estoppel precludes relitigation of an issue in a *subsequent, different cause of actions* between the same parties . . . ." *McMichael v McMichael*, 217 Mich App 723, 727; 552 NW2d 688 (1996) (emphasis added). Here, the issues raised in Green's first amended complaint are not issues raised "in a subsequent, different cause of action," so they are not barred by collateral estoppel.

does not protect her, then she can proceed with a claim that her discharge from the Commission violates public policy. However, "[p]ublic policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 526; 854 NW2d 152 (2014) (quotation marks and citation omitted). And "courts may only derive public policy from objective sources." *Id*. In this case, Green only alleges the existence of a public policy prohibiting her discharge, but she fails to identify any objective source for her public-policy claim. As a result, we conclude that the trial court did not err by dismissing her public-policy claim under MR 2.116(C)(8).

## III. CONCLUSION

In February 2018, the trial court granted summary disposition on Green's original WPA claim because she only alleged that she had reported or was about to report *planned* violations of law. Contrary to Green's arguments on appeal, the trial court did not analyze whether Green could establish the causation element of her original WPA claim. Accordingly, we affirm the court's February 2018 order granting summary disposition.

In July 2018, the trial court granted summary disposition of Green's amended WPA claim based on its application of the doctrine of res judicata. Because res judicata does not apply under the circumstances of this case, the trial court erred by granting summary disposition. Accordingly, we reverse the court's order summarily dismissing the amended WPA claim. On remand, the trial court shall address the County's argument that Green's amended WPA claim should be summarily dismissed under MR 2.116(C)(10). We affirm the trial court's July 2018 order summarily dismissing Green's public-policy claim.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction. No taxable costs are awarded. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello

-7-